**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Lead Plaintiffs Louisiana Sheriffs' Pension & Relief Fund and City of Fort Lauderdale Police & Firefighters' Retirement System*

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| DHIMANT PATEL, Individually and on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EDWARDS LIFESCIENCES CORPORATION, BERNARD J. ZOVIGHIAN, LARRY L. WOOD, SCOTT B. ULLEM, and DAVEEN CHOPRA,<br><br>Defendants. | Case No. 8:24-cv-02221-AH-KES<br><br>**AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 2

II. PARTIES ..... 7

1. Plaintiffs ..... 7

2. Defendants ..... 7

III. JURISDICTION AND VENUE ..... 9

IV. RELEVANT BACKGROUND ..... 10

1. Edwards' TAVR Business And The Importance Of TAVR Growth ..... 10

2. Edwards' TAVR Products Face Sales And Capacity Competition ..... 11

3. Edwards' TAVR Growth Stalled During The COVID-19 Pandemic Due To Hospital Capacity Constraints ..... 13

4. Defendants Benefited From The Post-COVID Boom In TAVR Growth, Including Through Lucrative Stock-Based Compensation ..... 14

V. OVERVIEW OF DEFENDANTS' DECEPTION OF INVESTORS ..... 15

1. Pre-Class Period, Defendants Issued Optimistic TAVR Growth Guidance ..... 15

2. During The Class Period, Defendants Repeated Their TAVR Growth Guidance And Denied Concerns About Restricted Growth ..... 17

3. Former Edwards Employees Reported That, Contrary To Defendants' Representations, Defendants Were Aware That Their TAVR Growth Projections Would Not Be Achieved, Including Due To Hospital Capacity Constraints ..... 19

4. Armed With Inside Knowledge Of Slowed Growth, Defendant Zovighian (CEO) Engaged In Suspicious Insider Trading ....28

5. Further Confirming Their Knowledge, Defendants Planned Strategic Acquisitions To Compensate For Slowed TAVR Growth ....28

6. The Truth Is Revealed: Defendants Stunned Investors With Slowed TAVR Growth And Slashed Edwards' TAVR Guidance ....29

VI. POST-CLASS PERIOD DEVELOPMENTS ....32

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ....33

1. Defendants' Material Misstatements And Omissions Concerning TAVR Growth ....34

(a) Defendants' Growth Misstatements Published On Edwards' Website Throughout The Class Period ....34

(b) February 6, 2024 Growth Misstatements ....35

(c) April 25, 2024 Growth Misstatements ....37

(d) June 5, 2024 Growth Misstatements ....38

2. Defendants' Material Misstatements And Omissions Concerning Capacity Constraints Restricting TAVR Growth ....39

VIII. ADDITIONAL ALLEGATIONS OF SCIENTER ....42

IX. LOSS CAUSATION ....45

X. PRESUMPTION OF RELIANCE ....48

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ....50

XII. CLASS ACTION ALLEGATIONS ....51

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ....53

COUNT I ....................................................................................53

For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a), (b), and (c) Promulgated Thereunder (Against All Defendants).......................................53

COUNT II ....................................................................................56

For Violations of Section 20(a) of the Exchange Act (Against The Executive Defendants).......................................56

COUNT III....................................................................................57

For Violations of Section 20A of the Exchange Act (Against Defendant Zovighian) ...............................................57

XIV. PRAYER FOR RELIEF ..........................................................................59

XV. JURY DEMAND..........................................................................60

Court-appointed Lead Plaintiffs, City of Fort Lauderdale Police & Fire Retirement System ("Fort Lauderdale P&F") and Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs," and, together with Fort Lauderdale P&F, "Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, bring this class action on behalf of themselves and all other persons or entities who purchased or otherwise acquired Edwards Lifesciences Corporation ("Edwards," or the "Company") common stock during the period from February 6, 2024 to July 24, 2024, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Lead Plaintiffs assert claims against Edwards and its corporate officers Bernard Zovighian, Larry Wood, Scott Ullem, and Daveen Chopra (collectively, "Defendants,"), under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b-5.

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, including the investigation of Lead Plaintiffs' counsel, which included, among other things: (i) review of Defendants' filings with the SEC; (ii) transcripts, press releases, news articles, analyst reports, and other public statements issued by or concerning Defendants; (iii) information supplied by former Edwards employees, industry professionals, and other knowledgeable persons described below; and (iv) other publicly available information. Counsel's investigation into the factual allegations contained in this Complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for further investigation or discovery.

# I. INTRODUCTION

1. This securities class action arises from Defendants' deception of investors regarding the growth of Edwards' primary product, Transcatheter Aortic Valve Replacement ("TAVR") artificial heart valves, and the hospital capacity constraints restricting that growth. During the Class Period, Defendants repeatedly told investors to expect 8%-10% sales growth for Edwards' TAVR products in 2024. They also specifically assured investors that hospitals capable of TAVR procedures had sufficient capacity to support that level of growth. Defendants' representations helped them portray Edwards as a company that would enjoy continued and sustainable growth with respect to its key product that was responsible for a majority of its revenues. But Defendants knew that TAVR growth at that level was illusory. Indeed, Defendants were aware from volume data they closely tracked that Edwards' TAVR sales had slowed significantly. They also knew that hospital capacity constraints rendered the projected levels of TAVR growth impossible. As detailed herein, Edwards' own former employees confirmed that Defendants' internal data showed from as early as 2023 that TAVR sales growth was slowing and hospitals that Defendants worked closely with were using their limited capacity to do different, non-TAVR procedures.

2. Investors learned the truth about Edwards' diminishing TAVR growth on July 24, 2024—when Defendants publicly admitted that TAVR sales growth was not what they had represented, including because it was inhibited by hospital capacity constraints. Defendants' revelation shocked the market, sparked a massive sell-off in the Company's securities, and caused the Company's stock price to plummet. Investors suffered enormous damages. To date, Edwards' stock price has not recovered.

3. Edwards is a medical technology company that makes artificial heart valves for patients with cardiovascular diseases. While Edwards offers several kinds of heart valves, its most profitable product line for several years has been TAVR

heart valves. TAVR valves are designed to be inserted into patients using a minimally invasive catheter procedure (as opposed to more traditional open-chest surgery). In each of 2021, 2022, and 2023, TAVR sales made up 65% of the Company's revenues.

4. During the COVID pandemic (prior to the Class Period), hospital capacity limitations restricted the Company's TAVR growth, as elective procedures like TAVR were dramatically reduced given the need to devote hospital resources to urgent, lifesaving procedures. Then, as the world moved out of the pandemic and leading up to the Class Period, Edwards' business benefited from a post-COVID boom when hospitals' capacity freed up as they shifted away from primarily acute care and started to again have the capacity to perform elective TAVR procedures. For example, in 2023, Edwards reported increased net sales "driven by sales growth of … TAVR products." As a result, Edwards' stock price increased, and Defendants reaped the rewards of their heavily stock-based incentive compensation packages, including valuable stock options, restricted stock units (RSUs), and performance-based restricted stock units (PBRSUs).

5. Given the critical importance of TAVR to Edwards' business, Defendants frequently touted the growth prospects of TAVR sales to investors. For example, just prior to the Class Period in December 2023, Defendants projected that TAVR net sales would grow by 8%-10% in 2024. Then, during the Class Period, Defendants doubled down on their growth projection, repeatedly assuring investors that they were confident that the Company would achieve 8% to 10% TAVR growth in 2024. Securities analysts accepted Defendants' assurances, echoing for example that the Company was "confident in its 8-10% y/y FY 24 TAVR guidance."

6. Defendants also assured investors that hospital capacity constraints were not posing a challenge to TAVR sales growth. These constraints arose from hospitals that were able to do TAVR procedures instead choosing to devote their limited capacity to performing different procedures that did not require the extra

staffing, resources, time-commitment, and costs associated with TAVR valves and generated more revenue than TAVR. For example, during the Class Period, Defendant Zovighian dismissed analyst concerns about capacity limits, representing that "lack of capacity" was not "a big challenge" for the Company. Defendant Chopra likewise assured investors that the Company worked closely with hospitals to "ensure that they do have capacity."

7. Defendants' representations were materially misleading. Contrary to their assurances about TAVR growth, but unbeknownst to investors, Defendants knew from closely tracked TAVR procedure volume data that their TAVR growth projections were misleading and could not be achieved in 2024. For example, a former Edwards employee reported firsthand that Defendants knew that there were problems with their TAVR growth guidance by no later than 2023—prior to the Class Period and three fiscal quarters before Defendants publicly disclosed the problems to investors. This former employee further recalled Company officials discussing the fact that TAVR volumes were "tapering off" during weekly internal calls and said that this reality was also clear from daily emails with "run reports." She also confirmed that Edwards executives deliberately withheld relevant data and manipulated market data to show purported growth for the Company. Indeed, this former Edwards employee reported that she was "in the room" for conversations with Edwards officials that made clear that data, market size, and market dynamics were being misrepresented.

8. Other former Edwards employees reported questioning the Company's publicly reported growth projections, stated that they did not align with internal Company data, or described them as not reasonable given TAVR's competition with other products. Others said they observed declines in the volume of TAVR procedures being performed prior to and during the Class Period. These mutually corroborating reports from former Edwards employees with direct knowledge of the Company's internal operations confirm that Defendants were aware that they were

misleading investors by repeatedly confirming their illusory TAVR growth projections during the Class Period.

9. Defendants were also aware of the hospital capacity constraints that precluded their projected 8%-10% TAVR sales growth in 2024 from being achieved, including because they knew that hospital transcatheter centers were not expanding, and the centers that existed were opting to do different procedures that were more efficient than Edwards' TAVR procedure. Accordingly, Edwards' TAVR sales were not growing, and could not grow at the rates that Defendants provided to investors. Knowing that TAVR growth would not continue consistent with their assurances to investors, Defendants negotiated acquisitions of other companies to enable Edwards to sell other heart health products as alternatives to TAVR.

10. Defendants' misrepresentations and omissions caused Edwards' stock price to be artificially inflated during the Class Period. Buoyed by Defendants' misstatements, the Company's stock price soared from less than $80 per share shortly before the start of the Class Period to a high of $95.56.

11. The truth about Defendants' misrepresentations and omissions was revealed to investors in a July 24, 2024 corrective disclosure. That day, Defendants revealed TAVR sales growth of only "6% year-over-year," which was "lower than [they] planned." Defendants also slashed their full-year 2024 TAVR sales guidance by more than 25% to "5% to 7% full year growth" instead of the 8% to 10% growth they had repeatedly touted to investors during the Class Period. Further, Defendants finally acknowledged that TAVR growth was being restricted by the very capacity constraints that Defendants had observed throughout the Class Period (and before) but had misleadingly assured investors would not pose a challenge. As Defendant Zovighian (CEO) explained during the earnings call that day, the decline in TAVR growth was due to the "continued growth and expansion of structural heart therapies … put[ting] pressure on hospital workflows."

12. Defendants' revelation of the truth caused Edwards' stock price to plummet as shocked investors ran for cover. Indeed, the Company's stock price fell from $86.95 on July 24, 2024, to $59.70 on July 25, 2024, a stunning decline of ***$27.25 or 31%*** on extremely heavy trading volume. This nosedive in Edwards' stock price ***erased over $16.4 billion in shareholder value*** in a single day, the largest such decline in the Company's history. To date, Edwards' stock has not recovered.

13. The broader market reaction to Defendants' revelation was equally dramatic. Indeed, securities analysts following Edwards announced that Defendants had "surprised investors with slower Q2 sales … rais[ing] investor concern over sustainable growth." Other analysts declared that Edwards' "TAVR Deceleration drives sales miss" and stated that the decline was "below even [their] somewhat conservative expectations" and had "shake[n] [their] confidence" in Edwards.

14. Tellingly, before the truth was revealed to investors, Defendant Zovighian (CEO) engaged in a highly suspicious sale of his Edwards stock holdings. A few weeks before the July 24 corrective disclosure, Zovighian quietly sold thousands of his Edwards shares, which allowed him to pocket over $755,000 by exploiting a stock price that was artificially inflated by his own and the other Defendants' material misrepresentations and omissions.

15. As set forth herein, Defendants made materially false or misleading statements or omissions and directly and indirectly engaged in conduct that constitutes a scheme to deceive and defraud in violation of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

16. As a result of Defendants' wrongful scheme, acts, statements and omissions, and the precipitous decline in the market value of the Company's common stock caused by the revelation of the truth, Lead Plaintiffs and other members of the Class have suffered enormous damages.

17. Lead Plaintiffs bring this action to recover the damage to Class members that Defendants' misconduct caused and to seek accountability for the violations of the federal securities laws alleged herein.

## II. PARTIES

### 1. Plaintiffs

18. Co-Lead Plaintiff City of Fort Lauderdale Police & Fire Retirement System ("Fort Lauderdale P&F") is a public pension fund that provides retirement benefits to over 2,000 police and firefighters and their families. As set forth in its previously filed certification (*see* ECF No. 35-2), Fort Lauderdale P&F purchased Edwards common stock at artificially inflated prices during the Class Period and suffered damage on those investments as a result of Defendants' violations of the federal securities laws alleged herein.

19. Co-Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") is a public pension fund that provides pension and other benefits for sheriffs, deputy sheriffs, and tax collectors in the state of Louisiana. Louisiana Sheriffs manages assets for the benefit of these active and retired employees and their beneficiaries. As set forth in its previously filed certification (*see* ECF No. 35-2), Louisiana Sheriffs purchased Edwards common stock during the Class Period and suffered damages on those investments as a result of Defendants' violations of the federal securities laws alleged herein.

### 2. Defendants

20. Defendant Edwards Lifesciences Corporation (defined above as "Edwards" or the "Company") is a medical technology company incorporated in the state of California, and headquartered in Irvine, CA. Edwards manufactures transcatheter and surgical heart valve products for patients with cardiovascular diseases. During the Class Period, Edwards sold two kinds of transcatheter heart valve products: Transcatheter Aortic Valve Replacement ("TAVR") and Transcatheter Mitral and Tricuspid Therapies ("TMTT"). During the Class Period,

the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "EW."

21. Defendant Bernard J. Zovighian ("Zovighian") was the Chief Executive Officer (CEO) and a Director of Edwards during the Class Period. Prior to becoming CEO and a Director in 2023, Zovighian served as President of the Company. Defendant Zovighian made materially false and misleading statements during the Class Period, including during Edwards' earnings call on February 6, 2024, in Edwards' Form 8-K and accompanying press release issued on April 25, 2024; and during Edwards' earnings call to discuss Edwards' financial results for the first quarter of 2024 on April 25, 2024. On May 30, 2024, Defendant Zovighian sold thousands of shares of his Edwards common stock at the artificially inflated price of $87.68 and pocketed over $750,000 from this illicit insider sale.

22. Defendant Larry L. Wood ("Wood") was the Corporate Vice President and the Group President of TAVR and Surgical Structural Heart Therapies of Edwards during the Class Period, a role he served in since 2007. Wood's responsibilities included key company research and development, operations, marketing, commercial, clinical and regulatory initiatives in transcatheter valve replacement. In 2023, Wood became Group President, which included oversight for Surgical Structural Heart at Edwards. Defendant Wood made materially false and misleading statements during the Class Period, including during Edwards' earnings call on February 6, 2024 and during Edwards' earnings call on April 25, 2024.

23. Defendant Scott B. Ullem ("Ullem") was the Corporate Vice President and Chief Financial Officer at Edwards during the Class Period, a role he had since 2014. His responsibilities included leading Edwards' global finance organization, and he had executive responsibility for Edwards' information technology, information security, risk management, indirect sourcing, and corporate services team. Defendant Ullem made materially false and misleading statements during the Class Period, including during Edwards' earnings call on February 6, 2024, during

Edwards' earnings call on April 25, 2024, and during an analyst call at the Jefferies Global Healthcare Conference on June 5, 2024.

24. Defendant Daveen Chopra ("Chopra") was the Corporate Vice President, Transcatheter Mitral and Tricuspid Therapies at Edwards during the Class Period. Previously, Chopra served as corporate vice president of Surgical Structural Heart at Edwards. Defendant Chopra made materially false and misleading statements during the Class Period, including during Edwards' earnings call on February 6, 2024 and during Edwards' earnings call on April 25, 2024.

25. Defendants Zovighian, Wood, Ullem, and Chopra are collectively referred to herein as the "Executive Defendants" and, together with Defendant Edwards, are referred to as "Defendants."

## III. <u>JURISDICTION AND VENUE</u>

26. Plaintiffs bring this action on behalf of themselves and other similarly situated investors to recover losses sustained in connection with Defendants' fraudulent violations of the federal securities laws.

27. Plaintiffs' claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

28. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

29. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Edwards is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

30. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of

interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## IV. RELEVANT BACKGROUND

### 1. Edwards' TAVR Business And The Importance Of TAVR Growth

31. Edwards is a medical technology company that makes artificial heart valves for patients with cardiovascular diseases. These valves are designed to be implanted into patients in one of two distinct kinds of procedures: minimally invasive transcatheter procedures (involving the use of a catheter), and traditional open chest procedures. During the Class Period, Edwards sold two main kinds of transcatheter heart valve products: Transcatheter Aortic Valve Replacement ("TAVR") and Transcatheter Mitral and Tricuspid Therapies ("TMTT").

32. TAVR valves are used to treat aortic stenosis—a chronic narrowing of the aortic valve which allows blood to pass from the left ventricle to the aorta. For many decades, the standard treatment for aortic stenosis was open heart surgery, which is highly invasive as a patient had to have their sternum "cracked open" to access the chest interior and had to be placed on a heart-lung machine to circulate the blood while the heart was stopped during the operation. Over a decade ago, the TAVR catheter-based approach was developed, which was minimally invasive as it enabled doctors to replace a diseased aortic valve by implanting a new, biologic aortic valve prosthesis through a catheter inserted through a small incision in the skin.

33. Edwards' primary and most profitable business line has been TAVR for years. As reported in the Company's Annual Report for the fiscal year ended December 31, 2023, Edwards' TAVR business was responsible for approximately 65% of the Company's revenues in each of 2021, 2022, and 2023. Indeed, in each of those years, Edwards reported increased net sales "driven by sales growth of …

TAVR products." Defendants also described TAVR as Edwards' "largest business" and accordingly stated that TAVR was their "number one focus."[1]

34. Defendants' primary sales pitch to attract investors to Edwards before and during the Class Period was the Company's prospects for growth. For example, in his "Letter to Shareholders" contained in Edwards' 2023 Annual Report, Defendant Zovighian's (CEO) key theme was the Company's ability to "deliver sustainable growth" to investors. Indeed, Zovighian cited this theme repeatedly, touting for instance Edwards' opportunities to "deliver sustainable growth," its "commitment to organic growth," it being positioned for "durable long-term growth," and describing how Edwards' business "translates into sustainable growth for Edwards and our shareholders for years to come."

35. Given TAVR's status as Edwards' main product line and profit center—and the critical importance of Edwards' growth prospects to investors—Defendants' ability to generate continued and sustainable double-digit growth in the TAVR sector was essential to the Company's success and its ability to attract investors.

**2. <u>Edwards' TAVR Products Face Sales And Capacity Competition</u>**

36. The medical technology industry is highly competitive. Edwards' TAVR products face intense competition for sales from multiple other companies, including Medtronic PLC, Abbott Laboratories, and Boston Scientific Corporation who each vie to increase their respective share of the global market for TAVR.

37. Edwards' TAVR products face another form of competition that also impacts the Company's sales—namely, competition for hospital capacity from other heart valve products, including the Company's own TMTT product line. For

[1] Edwards' other main groups of product lines include TMTT (3% of 2023 net sales), Critical Care (16% of 2023 net sales), and Surgical Structural Heart therapy (16% of 2023 net sales).

example, although TAVR and TMTT are different procedures with different requirements, both procedures are generally performed at the same transcatheter heart center at a given hospital. As such, the two product lines are in direct competition for hospital capacity—with sales being a zero-sum game between these products. Before the Class Period, Edwards' TMTT business comprised of its PASCAL product, which launched in 2022. In February 2024, the FDA approved Edwards' new TMTT product called EVOQUE, which increased the competition Edwards' TAVR sector faced for hospital capacity.

38. For example, as further discussed below, a former Edwards Vice President (the "Former Edwards VP") interviewed by an Alphasense analyst[2] explained that hospital centers would have to dedicate certain days to certain procedures—so, for example, a hospital would do exclusively TAVR procedures on a "TAVR Day" and exclusively EVOQUE TMTT procedures on an "EVOQUE Day." Further, a given hospital's heart center could generally not do a TAVR procedure and a TMTT procedure on the same day.

39. For Edwards, these structural capacity constraints meant as a practical matter that a new TMTT product like EVOQUE did not serve to expand the Company's sales and revenue growth. Rather, an EVOQUE TMTT sale by the Company would merely replace what would otherwise have been a TAVR sale with no resulting enhancement of Edwards' overall growth. Additionally, while a product might experience early sales growth shortly after it is launched, it could take months if not years before that product would be profitable. As Defendant Ullem explained during the April 24, 2024 TD Cowen 44th Annual Health Care Conference, "early stage product launches" like EVOQUE "are ***dilutive to gross margins***," including due to the upfront costs that must be invested by Edwards to scale such a product in

[2] *Former Competitor Is Positive Toward Growth in the TAVR Market Although Magnitude Is Very Difficult to Quantify*, November 8, 2024, Alphasense, Inc.

order to build towards widespread adoption. Thus, Defendants understood that it would take time and money before EVOQUE would generate "higher volumes" and for Edwards to "get more overhead absorption and grow profits."

40. This competition for hospital capacity was also presented by Edwards' competitors' different heart valve products. For example, the Former Edwards VP reported that transcatheter procedures such as Boston Science's WATCHMAN, a procedure designed for patients suffering from Atrial Fibrillation, were performed in the same hospital centers as TAVR and TMTT. Accordingly, on any given day, a hospital center equipped to do Edwards' TAVR procedure would have to decide between doing an Edwards' TAVR procedure, a competitor's TAVR procedure, an Edwards' TMTT procedure, or another procedure offered by a competitor such as WATCHMAN.

41. Thus, a hospital would have to consider: How many procedures can be done in a single day? How many staff members are necessary to do each procedure? What is the cost? How much does the hospital receive in insurance reimbursement for each procedure? And, because demand for transcatheter heart therapies greatly exceeded supply and hospital capacity, the hospitals invariably had to choose the most efficient procedure in terms of time, resources, cost, and revenue. As detailed herein, former Edwards employees confirmed that, prior to and during the Class Period, hospitals were increasingly choosing products *other* than Edward's TAVR procedure, which necessarily caused a decline in demand for that product and stalled TAVR growth.

### 3. <u>Edwards' TAVR Growth Stalled During The COVID-19 Pandemic Due To Hospital Capacity Constraints</u>

42. During the COVID-19 pandemic, hospital capacity constraints directly and negatively impacted Edwards' TAVR growth as hospitals were required to devote scarce resources to emergency procedures and forgo elective procedures like TAVR. Thus, after years of expanding growth, Edwards noted during a December

10, 2020 investor conference that its 2021 growth outlook was impacted by "a couple of key headwinds … including reduced elective procedure volumes or continued hospital capital budget constraints due to COVID." Hospital capacity constraints continued to plague Edwards through 2021, with Defendant Chopra noting during the December 8, 2021 investor conference that only "lifesaving surgeries were generally prioritized," and that hospital capacity was "very tight, they feel the pressure, they're waiting for the person to get out of the ICU so that – a patient to get out of the ICU so they can finish the surgery." Likewise, during Edwards' January 31, 2023 earnings call, then-CEO Michael A. Mussallem flagged the fact that "U.S. TAVR procedure volumes [were being] impacted by the US hospital staffing constraints."

**4. Defendants Benefited From The Post-COVID Boom In TAVR Growth, Including Through Lucrative Stock-Based Compensation**

43. Then, as the world moved out of the pandemic, Edwards' business benefited from a post-COVID surge as hospitals shifted away from performing mainly emergency procedures and started to again have capacity to perform elective procedures like TAVR. For example, in 2023, Edwards reported increased net sales "driven by sales growth of … TAVR products." As a result, Edwards' stock price soared, increasing from, for example, $61.71 per share on October 27, 2023 to $76.25 per share on December 29, 2023.

44. As Edwards' stock price increased, Defendants reaped the benefit of their heavily stock-based incentive compensation packages, including valuable stock options, restricted stock units (RSUs), and performance-based restricted stock units (PBRSUs). For example:

a. in 2023, Defendant Zovighian (CEO) received a total of $10,599,764 in stock and option awards, which represented over 82% of the value of his total compensation of $12,869,020 and dwarfed his salary of $972,814. This was an increase from his 2022 compensation—when he

received stock and option awards worth $2,302,080 as part of a total pay package worth $3,338,427.

b. in 2023, Defendant Ullem (CFO) received a total of $4,599,479 in stock and option awards, which represented over 77% of the value of his total compensation of $5,949,153 and dwarfed his salary of $743,421. This was an increase from his 2022 compensation—when he received stock and option awards worth $2,771,614 as part of a total pay package worth $3,861,399.

c. in 2023, Defendant Wood (VP, Grp. Pres of TAVR) received a total of $3,909,455 in stock and option awards, which represented over 72% of the value of his total compensation of $5,395,034 and dwarfed his salary of $763,227. This was an increase from his 2022 compensation—when he received stock and option awards worth $2,458,371 as part of a total pay package worth $3,558,821.

Thus, Defendants were motivated to keep Edwards' stock price as high as possible—and the path to doing so was to promise investors continued and sustainable growth in TAVR sales.

## V. OVERVIEW OF DEFENDANTS' DECEPTION OF INVESTORS

### 1. Pre-Class Period, Defendants Issued Optimistic TAVR Growth Guidance

45. Just prior to the Class Period, at Edwards' 2023 Investor Conference held on December 7, 2023, Defendants told investors that they projected 8%-10% net sales growth in the TAVR sector for 2024. According to their presentation materials issued that day, Defendants' 8%-10% growth outlook for TAVR purportedly took into account "Competitive product launches" as a headwind, but listed "Improving healthcare system capacity" as a tailwind:




Defendants' above slide remained published on the Company's website throughout the Class Period.

46. Defendants' guidance comforted investors that Edwards would continue its growth trajectory in its key TAVR product line. As a result, Edwards stock price increased steadily over the next several trading days from $68.26 at the close on December 7, 2023, to $77.76 at the close on December 14, 2023. This $9.50 price surge alone caused the Company's market capitalization to increase by over $5.7 billion.

47. Analysts reacted favorably to Defendants' 2024 TAVR guidance. For example, Evercore analysts concluded that "FY24 TAVR seems derisked given 8-10% outlook." Likewise, Barclays analysts wrote "Mgmt's 2024 sales growth guidance of 8-10% should help ease some of the qtr-to-qtr uncertainty around results, making the stock easier for investors to own."

48. On February 2, 2024, Defendants announced that the FDA had approved Edwards' new TMTT product, EVOQUE, which Defendants had indicated that they expected to happen in 2024.

**2. <u>During The Class Period, Defendants Repeated Their TAVR Growth Guidance And Denied Concerns About Restricted Growth</u>**

49. Throughout the Class Period, Defendants continued to reiterate to investors their optimistic growth projection for TAVR sales in 2024. For example, on February 6, 2024—the start of the Class Period—Defendant Ullem told investors that Edwards was "maintaining" its "previous sales guidance range[]" for TAVR of 8-10% growth in 2024. Defendant Zovighian similarly told investors that Defendants were "confident in the future of TAVR" and its growth prospects.

50. Analysts covering Edwards reacted positively to Defendants' continued assurances of 8%-10% growth in TAVR sales for 2024. For example, RBC raised its price target from $82 to $95, noting that Edwards had "reiterated its 2024 outlook that it introduced at its December Investor Day." Similarly, Wells Fargo maintained its Overweight rating, noting "TAVR guidance was maintained at … +8-10% y/y."

51. Defendants again maintained their 2024 TAVR sales guidance by reiterating it in Edwards' Q1 2024 earnings release. Even more, Defendants did so despite Edwards only achieving 6% TAVR growth in that quarter. Defendants dismissed any concerns from market participants, reassuring investors that the Company's results were proceeding according to their plan and re-affirming their prior 8-10% TAVR growth guidance.

52. For example, on April 25, 2024, Defendant Zovighian advised investors that Defendants were "confident about our 8% to 10%" projection for TAVR growth in 2024. He also denied concerns about slow Q1 2024 growth, stating that Defendants "knew that the growth would ramp throughout the year and that Q1 would be our lowest growth quarter." Defendant Wood echoed Defendant Zovighian's statements, assuring investors that they "always" "expected" lower growth in Q1, but "expect[ed] to see an increase in Q2 over Q1."

53. In addition, Defendants dismissed concerns about limited hospital capacity for TAVR—notwithstanding the launch of the Company's EVOQUE TMTT product. For example, in response to an analyst question about hospital capacity, Defendant Zovighian stated that Edwards had not experienced "the centers having a lack of capacity to be able to treat patients" for either TAVR or EVOQUE. Defendant Chopra denied that "EVOQUE procedures, for any time in the near future, are going to affect overall capacity."

54. Defendants also asserted that they closely tracked hospital capacity, particularly in the context of the launch of EVOQUE. Specifically, Defendant Wood explained that he and Defendant Chopra worked with transcatheter hospital centers on capacity "every day" and that they "partner very closely" on capacity. Defendant Wood further assured investors that this is "a key part of when we start centers, making sure that they have a whole program that encompasses their entire structural heart patient population."

55. Analysts accepted Defendants' assurances of growth in TAVR. For example, in an April 25, 2024 report, the Evercore analyst echoed Defendants' assurances concerning TAVR, stating "EVOQUE procedures won't affect overall capacity in the near future; haven't seen centers having lack of capacity to treat patients." An April 25, 2024 Deutsche Bank analyst report noted that Defendants' maintained 8-10% TAVR growth guidance "assume[d] acceleration in the back half even despite more difficult 2023 comps."

56. During analyst conferences on June 5-6, 2024, Defendants continued to reiterate their projection of 8-10% growth for TAVR in 2024. For example, Defendant Ullem told investors that they continued to expect 8% to 10% growth for 2024, and that higher growth in the second half of the year had always "been our plan." Meanwhile, Defendant Ullem assured investors that capacity constraints the Company suffered during COVID were "ancient history now."

**3. Former Edwards Employees Reported That, Contrary To Defendants' Representations, Defendants Were Aware That Their TAVR Growth Projections Would Not Be Achieved, Including Due To Hospital Capacity Constraints**

57. Contrary to their repeated assurances to investors, Defendants knew that Edwards' growth in the TAVR market had stalled, and that hospitals did not have sufficient capacity to support Defendants' stated TAVR growth projection. As detailed below, former Edwards employees with firsthand knowledge from inside the Company confirmed that Defendants knew before the Class Period that growth had slowed for Edwards' TAVR valves and that capacity constraints were restricting TAVR growth in 2024. Indeed, Defendants knew that hospitals with transcatheter centers were opting to use their limited capacity to do EVOQUE and other transcatheter procedures—that were faster and/or generated more revenue for the hospital—instead of TAVR, which was more time consuming and generated less revenue. These former Edwards employee accounts were provided independently by multiple individuals who had direct experience working at Edwards in different roles and at different times—but their reports are strikingly consistent and, thus, mutually corroborating.

58. As also explained below, further demonstrating their awareness that TAVR growth had stalled, Defendants entered into non-public negotiations to acquire companies that produced structural heart products that were alternatives to TAVR. Even more, Defendant Zovighian engaged in a highly suspicious sale of stock in May 2024, which enabled him to sell at a price artificially inflated by Defendants' misrepresentations and omissions just prior to the truth being revealed.

59. Former Edwards employee #1 ("FE-1")[3] worked at the Company as a Director, Sales Enablement & Development in the Structural Heart division from August 2022 to July 2024. In this position, FE-1 was part of the senior leadership team for U.S. sales and was responsible for *inter alia* the performance of sales representatives, compliance, coaching managers, new hire education, and ongoing education. In particular, FE-1 was tasked with maximizing the performance of sales representatives in the U.S., which was Edwards' biggest market. She described another of her roles at Edwards as being to help "story tell" the data by, for example, recounting stories of patients who transitioned out of the hospital. FE-1 reported to Edwards' SVP of U.S. Commercial and supervised a team of employees at the Company. FE-1 previously worked for Medtronic—one of Edwards' competitors, including specifically with respect to TAVR products.

60. FE-1 reported that, during her tenure at Edwards, she was "in the room" for conversations with Edwards officials that made clear that data, market size, and market dynamics were being misrepresented. FE-1 further said she raised concerns about Edwards being unable to achieve expectations.

61. FE-1 further stated that, by the first quarter of 2024, TAVR sales had been "sluggish" for a while, the first quarter 2024 numbers were "looking shitty," and it was obvious that the second quarter of 2024 was going to be bad. She recounted that Edwards overpromised the market and underdelivered. FE-1 confirmed that Edwards executives decided to withhold relevant data and manipulated market data to show purported growth for the Company.

62. For example, FE-1 reported that Edwards executives knew there were problems with TAVR growth long before they cut TAVR revenue projections in July

[3] Former Edwards employees are referred to herein as "FEs" and all are referenced using feminine pronouns regardless of their actual gender in order to maintain their confidentiality.

2024. FE-1 stated that they knew about these problems at least three quarters before they reported it publicly—and specified that Edwards executives knew this reality as early as 2023. She elaborated that Edwards executives' knowledge meant that they knew by then (*i.e.*, 2023 and prior to the Class Period) that the Company would *not* be hitting its forecasts. FE-1 elaborated that the omitted market data was based on procedure volumes—and that Edwards executives were aware from this data that the volume was going to taper off. FE-1 suggested that Edwards executives withheld this information because they feared how Wall Street was going to react. According to FE-1, when Edwards executives overpromised the market, Wall Street rewarded them.

63. Detailing the types of data collected at Edwards, FE-1 said that the Company knew exactly how many patients were in its pipeline, what was coming, and she said that the Company could project procedure volume over 18 to 24 months. FE-1 emphasized how closely the Edwards executives watched these data on a daily basis. She said that Edwards had dashboards depicting the data—mostly Salesforce data—and Edwards executives had full access to the data, they all talked about this data, they knew every day what valves were to be implanted, and they even questioned what was going on at specific hospitals.

64. Further, FE-1 participated in a weekly internal Edwards call to discuss this data—and said her boss (SVP of U.S. Commercial) confirmed on such a call that volumes were "tapering off." She also said that she was on emails, which included Edwards executives, that distributed regular internal reports on a daily basis with data depicting this volume decline, which were referred to as "run reports." These reports provided very granular detail regarding the entire calendar year, the forecast for that year, and the percentage to the day, week, month, quarter, and year.

65. Former Edwards employee #2 (FE-2) worked at the Company as a Senior Manufacturing Engineer from March 2016 through November 2024. She

worked on the delivery systems for the heart valve part of TAVR within in the so-called "clean" room in an engineering capacity.

66. FE-2 recalled Town Hall meetings at Edwards that were held on a quarterly basis. According to FE-2, Edwards executives including Defendants Zovighian, Wood, and Ullem spoke at the Town Hall meetings. FE-2 further stated that hospital capacity projections were discussed at these meetings. FE-2 said that, starting prior to the Class Period and as early as 2021, Edwards executives including Defendant Zovighian would discuss the rates at which the Company would enroll patients in clinical trial at Town Hall meetings, but those enrollment rates did not match the consistent incline the Company publicly projected in terms of growth to investors. Specifically, FE-2 recalled Defendant Zovighian discussing patient enrollment in TAVR programs at Town Halls. FE-2 also noted that these forecasts did not align with her experience. Part of FE-2's role was to support clinical trials; she noticed that Edwards would aggressively promote new products or trials and then suddenly pause production. FE-2 was told by Joseph Nuzzolese, Edwards' Corporate VP, Global Supply Chain & Quality (who was part of Edwards' Executive leadership team)[4] that the trials were paused because they were at capacity. While the Company was saying publicly there was going to be TAVR growth, FE-2 did not see it based on the internal data and she questioned how Edwards could reach the targeted revenue.

67. FE-2 stated that Edwards experienced limited TAVR growth during COVID due to hospital constraints, and that, given that experience, Edwards executives understood that Edwards was reliant on hospital capacity to meet its growth expectations and that hospital capacity constraints could reduce growth in the future.

[4] https://www.edwards.com/about-us/our-leaders.

68. FE-2 further expressed that, in Q1 2024, Edwards executives wanted to keep investors excited—but if they kept telling investors that there was no growth in clinical or production, or that they might miss their targets, the fear was that investors would start pulling out of Edwards stock. Instead, according to FE-2, in Q1 2024, the Company was trying to make it all look pretty to investors and dressing up a pig.

69. Former Edwards employee #3 ("FE-3") worked at the Company as a Clinical Specialist from January 2021 to January 2025. FE-3 tracked and documented every TAVR procedure that took place within the Oklahoma region she was responsible for and sent a report of each such procedure to an internal Edwards database.

70. FE-3 reported that she noticed a drop-off of TAVR procedure volumes in the first quarter of 2024, which was reflected in the data she entered in Edwards' internal TAVR volume reports. Specifically, FE-3 reported documenting a 20%-40% decrease in TAVR volumes between Q4 2023 and Q1 2024. FE-3 also reported that providers in her region explained that they were doing fewer TAVR procedures because of constraints relating to surgical staffing and other administrative complications. FE-3 explained that, at the end of 2023, the average number of TAVR procedures in her region was 10 to 15 per week. However, in Q1 2024, the average number of TAVR procedures dropped to just 8-10 per week.

71. Further, FE-3 said she was told by hospital administrators in her region that hospitals were short-staffed and that staff members were so busy they had to start scheduling procedures on the weekends. As such, hospital administrators placed more emphasis on profitable procedures and not TAVR. According to FE-3, these administrators said that the capacity constraints were the reason why they were doing fewer TAVR procedures in Q1 2024. For example, one hospital in FE-3's region began to stack their TAVR procedures into just a single day each week, rather than doing multiple days per week. Then, there would be weeks when the hospital did not

do any TAVR procedures at all. The hospital administrators told FE-3 that they had patients but could not perform the TAVR procedures due to staffing and financial reasons.

72. Former Edwards employee #4 ("FE-4") was a Senior Director of Global Health Economics & Reimbursement at Edwards from July 2022 to March 2024. FE-4 was on the innovation team, which was supported by Edwards' TAVR business. She said she was on the market access side of the business—so was keenly aware of hospital financials, what it takes to run a hospital, and get patients treated. She was also aware of hospital resource constraints, including the constraints that happened during COVID.

73. FE-4 recalled internal meetings at Edwards before she left where Company executive leadership would discuss what they thought about hospital constraints, which they characterized as headwinds. FE-4 said she believed their story for a bit—but then it did not seem to fit and their story did not align with everything else at the Company.

74. As noted above (¶38), a Former Edwards VP participated in an interview with an Alphasense analyst on November 5, 2024 concerning growth in the TAVR market and the impact of capacity and competition. As reported in the interview, the Former Edwards VP spent 12 years at Edwards in the areas of "commercial strategy, upstream and downstream marketing, sales operations, market research."

75. In the interview, the Former Edwards VP explained that, even when there remains a large unmet patient need, TAVR's sales growth is nevertheless limited by "operational challenges, supply and capacity constraint challenges" that impose a "natural ceiling" such that "there are limits to growing infinitely forever." For example, the Former Edwards VP pointed to the number of "TAVR centers … in the universe" as one example of such a constraint, stating "the number of centers are capped."

76. The Former Edwards VP explained that another key capacity constraint specific to TAVR is "the dual operator requirement of TAVR" because "[c]omparable procedures do not require dual operators." To illustrate, the Former VP explained that Boston Scientific's WATCHMAN product requires only "a single-operator … procedure" and therefore its procedure can be "done in 20 minutes" with fewer staff involved. In contrast, TAVR requires two operators, involves more steps to get "up and … running," involves more staff ("up to a dozen people"), and "takes longer." Thus, according to the Former Edwards VP, hospital centers capable of doing transcatheter device procedures:

> "have a choice to make … 'Do I do a WATCHMAN day or do I do a TAVR day? Maybe I can only do two to three TAVRS a day, but I can do six to 10 WATCHMANs in a day' That is a huge difference."

As such, the Former Edwards VP stated: "there's actually more WATCHMANs being done now than TAVR."

77. Further, the Former Edwards VP recalled a discussion with "one clinician that has done TAVRs for over 10 years," who explained:

> "'Six to eight years ago, the only thing going on was TAVR. We just did it. It was easy. It just grew and grew, but now, we've got these six to eight other procedures we're doing. Just as tough. The mindshare is really different now. We've got to be very planful. We've got to have dedicated procedure days.'"

The Former Edwards VP added that catheter lab clinicians "went from an era of, 'Just treat anyone. It's fine. Centers are growing. Everything's growing. It's all good,' to 'Oh my gosh. We've got to make real choices now about what we do. We've got to be more intentful about what we do.'" As such, according to the Former Edwards VP, the capacity constraint "is that the number of TAVR centers, there's not a lot of new centers to go in the market. The only way to naturally grow is to change the actual efficiency of the hospital themselves."

78. In addition, the Former Edwards VP explained that, while TAVR procedures have grown substantially over the past 25 years as a less-invasive means of implanting replacement aortic valves, they remain complicated and time-consuming. They require specialized hospital centers staffed with qualified operators. Many hospitals that have transcatheter centers can only do one type of transcatheter procedure in a single day. For example, a hospital's transcatheter center may have a dedicated "TAVR day" when the center uses the entire day to do TAVR procedures, as well as a dedicated "EVOQUE day," and so on. However, with the emergence of new transcatheter procedures that hospitals could do more of in a single day, or that the hospital would be reimbursed for at a higher rate, hospitals would frequently choose to do such procedures over TAVR.

79. Moreover, according to the Former Edwards VP, although "TAVR … had a good run of growth," the hospital "structural heart programs … [are] very focused on the new and shiny and the new-news and the new product."

80. Former Edwards employee #5 ("FE-5"), was a Senior Product Manager at Edwards from May 2020 to September 2023. FE-5 was the Product Lead/Manager on the PASCAL device, which was one of Edwards' TMTT programs that was approved in the United States in 2022. FE-5 initially reported to Matt Mettler, who was a Regional Director, US Sales at Edwards (previously VP, Upstream Marketing), and later reported to Erin Fleischacker, Director of Global Marketing at Edwards.

81. FE-5 stated that, during her tenure in the Spring of 2023, she witnessed the PASCAL and EVOQUE products cannibalize TAVR sales. FE-5 recalled a company-wide Town Hall meeting that took place around March of 2023 where TAVR rates and percentages were discussed. According to FE-5, the TAVR numbers were falling off—and those who were aware of the numbers knew there was a decline. FE-5 said the numbers fell-off in part due to the lack of capacity to to support the device. After this Town Hall meeting, FE-5 and her colleagues discussed

the decline in TAVR rates, which they saw to be a red flag. FE-5 said that they raised the issue with Matt Mettler. FE-5 further reported her understanding that the issue was raised by Mettler and other Vice Presidents with Defendant Zovighian (who had not taken over as CEO at that point).

82. FE-5 stated that the data and numbers presented by Edwards publicly seemed to be inflated and the growth projected was far too aggressive, including for TAVR. Indeed, FE-5 remembered thinking in 2023 that Edwards' growth projection was very aggressive and borderline unrealistic. FE-5 stated that it was not reasonable for Edwards to claim that it could deliver on TAVR growth projections considering new technologies such as PASCAL and EVOQUE. According to FE-5, this was because the same physicians were now doing three different procedures instead of only TAVR procedures.

83. FE-5 stated that physicians would frequently do in-person visits to Edwards, at which point each of the TAVR, EVOQUE, and PASCAL teams would schedule time to meet with the physicians. They did this because there was so much overlap with the physicians doing each of those three procedures. According to FE-5, who had access to the agendas for the physician's site visits, Defendant Chopra had a policy that the Company would schedule 30 minutes to meet with the physicians when they were at Edwards. Defendant Zovighian had the same policy before he was promoted to CEO when he held Defendant Chopra's position. The agendas for the physician visits, which included meetings attended by Defendants Chopra and Zovighian, set forth which of the TAVR, EVOQUE, and PASCAL teams were meeting with which physicians.

84. Confirming the experiences of these former Edwards employees, Defendants themselves admitted on July 24, 2024 that the "***growth in other procedures***" were "***taxing***" hospitals' structural heart teams, including because hospitals wanted "to be able to offer all of the therapies." Moreover, as Defendants

also admitted, Edwards' own EVOQUE procedure was contributing to these hospital capacity restrictions.

### 4. <u>Armed With Inside Knowledge Of Slowed Growth, Defendant Zovighian (CEO) Engaged In Suspicious Insider Trading</u>

85. Tellingly, deep into Edwards' second quarter and armed with the above-described knowledge of slowed TAVR growth and limited hospital capacity, Defendant Zovighian (CEO) engaged in a highly suspicious sale of his Edwards stock holdings.

86. On May 30, 2024, Zovighian sold 8,617 shares at a price of $87.68. This allowed Zovighian to pocket over $755,500 from his sale of Edwards stock at a price that had been artificially inflated by his own misrepresentations and omissions during the Class Period (as well as those of the other Defendants). Tellingly, Zovighian made this sale *before* Defendants revealed the truth to investors on July 24, 2024. Even more suspicious, Zovighian had not sold *any* of his Edwards stock holdings during the equivalent six-month period *prior to* the Class Period.

### 5. <u>Further Confirming Their Knowledge, Defendants Planned Strategic Acquisitions To Compensate For Slowed TAVR Growth</u>

87. During the Class Period, Defendants also investigated, negotiated, and agreed to multiple acquisitions of companies with therapies alternative to TAVR in order to compensate for slowing TAVR growth. The acquired companies included JenaValve, "a pioneer in the transcatheter treatment of aortic regurgitation," Endotronix, "a leader in heart failure management solutions," and Innovalve, an early-stage transcatheter mitral valve replacement company.

88. Former Edwards employees confirmed that Defendants were actively working on these acquisitions during the Class Period. Specifically, FE-4 confirmed that the Endotronix acquisition was in the works long before Defendants issued the July 24, 2024 corrective disclosure. She worked with emerging technologies and, thus, was personally aware of Edwards' negotiations to acquire Endotronix. FE-4

confirmed that the Company was working through internal milestones to acquire Endotronix since prior to the start of the Class Period.

89. Further corroborating the former employee accounts, Defendant Zovighian (CEO) himself admitted when these acquisitions were announced in July 2024 (as further discussed below) that Defendants' "[d]iscussions with the companies have been ongoing for some time."

90. The fact that Defendants devoted considerable time to undertaking these expensive acquisitions during the first half of 2024 further confirms that Defendants were internally well aware that TAVR growth was declining and, therefore, they had to diversify Edwards' product portfolio in an effort to compensate for the decline. Even more suspicious, Defendants planned and executed these acquisitions confidentially—while at the same time they were publicly touting to investors the growth prospects of the Company's existing TAVR product line.

### 6. The Truth Is Revealed: Defendants Stunned Investors With Slowed TAVR Growth And Slashed Edwards' TAVR Guidance

91. On July 24, 2024, in connection with Edwards' second quarter 2024 (Q2 2024) financials, Defendants shocked investors by announcing "lower-than-expected growth in TAVR." Specifically, Defendants disclosed that Q2 2024 TAVR sales experienced only 6% growth year-over-year, which was lower than the projections that Defendants had repeatedly provided to investors. Defendants also slashed Edwards' full-year 2024 revenue guidance for the TAVR platform. Specifically, Defendants reported that they were "now anticipat[ing] second half TAVR sales growth similar to the first half year-over-year growth rate, 5% to 7% full year growth," which was down 25% from the 8% to 10% growth that Defendants had forecasted and repeatedly emphasized to investors.

92. In the evening on July 24, 2024, after trading hours, Defendants held an earnings call, in which Defendants Zovighian, Wood, Ullem, and Chopra

participated. During the call, Defendants attributed the dramatic slowing of TAVR growth to hospital capacity issues. For example:

a. Defendant Zovighian attributed the TAVR growth decline to product competition straining hospital capacity, as he stated the drop-off was due to the "continued growth and expansion of structural heart therapies … put[ting] pressure on hospital workflows."

b. Defendant Wood likewise stated that the "burden" on hospitals of the "growth in other procedures" was "taxing" hospitals' structural heart teams so it was "a matter of the workflow." Later, Wood elaborated that "when new therapies come forward, hospitals are competitive … [t]hey want to be able to offer all of the therapies … and make sure that they can offer all of the options for their patients."

c. Defendant Zovighian admitted that Edwards itself was "contributing a little bit on this pressure," including through its TMTT products like EVOQUE, so "we have seen hospitals facing like more to do, more technology to adopt, to be trying on new technologies."

93. Also during the call, analysts questioned how long Defendants had known about these capacity constraints on TAVR growth. For example, a Jefferies analyst asked why the TAVR capacity issue was "showing up so acutely now" and whether it was "an issue that's been matriculating for a while." In response, Defendant Chopra acknowledged the capacity constraints described above, stating for example "there is just a point in time where you hit a wall" and "[i]t's the cumulative effect of all of these things that have played out over time," which only then Defendants had "reflected … in our guidance" because they now "wanted to be realistic and not be tone deaf."

94. On the call, Defendant Chopra further stated "none of us are happy with the growth rate … [n]one of us are happy adjusting guidance." Defendant Zovighian

echoed: "we are not happy as a company … so we are all fully aligned about it is a problem [and] [we] need to solve it."

95. As noted above, also on July 24, 2024, Defendants announced multiple acquisitions of companies with non-TAVR products. On the earnings call that day, Defendant Zovighian admitted that "[d]iscussions with the companies have been ongoing for some time."

96. The market reaction to Defendants' disclosures was swift and severe. Analysts were shocked. For example:

a. Barclays analysts wrote "Mgmnt surprised investors with slower Q2 sales … rais[ing] investor concern over sustainable growth."

b. UBS analysts wrote "TAVR Deceleration drives sales miss," which was "below even our somewhat conservative expectations" and has "shake[n] our confidence" in Edwards.

c. Canaccord Genuity analysts lowered their price target, noting that "[t]he miss in Edwards' core business certainly concerned investors, evident by the stock price movement after the close and the volume of TAVR questions during the conference call."

d. J.P. Morgan analysts reduced their rating of Edwards, slashed their price target, and highlighted that the revelation of "TAVR growth decelerating" forced them to cut predicted growth for the Company in 2025 and 2026 because they "don't expect a quick rebound" for Edwards.

97. On the investing show Market Rebellion, hosts Jon and Pete Najarian noted that Edwards "disappointed in so many different categories" and that they had to cut their guidance because "the biggest money maker that they've got is absolutely getting hammered, so that's not good, and that means margins aren't very good

either, as a matter of fact margins are dropping to their lowest levels ever." They also noted that Edwards' Q2 earnings were the "worst earnings in nine years."[5]

98. In addition, the suspicious timing of Defendants' acquisitions was specifically flagged by market participants. As one analyst wrote, ***"[w]hen a growth company announces a series of acquisitions as its key product begins to slow, it increases the doubt if the TAVR market is as strong as management had previously discussed***."

99. Investors were equally stunned and immediately ran for cover. Indeed, due to Defendants' July 24, 2024 disclosures, Edwards' stock price plummeted, nosediving by $27.25 from a closing price of $86.95 per share on July 24, 2024, to $59.70 per share on July 25, 2024 on heavy trading volume. This ***precipitous 31.34% decline wiped out $16.4 billion in shareholder value in a single day***, the largest such decline in the Company's history. To date, Edwards' stock has not recovered.

## VI. POST-CLASS PERIOD DEVELOPMENTS

100. On October 24, 2024, Edwards published a press release filed with the SEC on Form 8-K announcing its financial results for the third quarter of 2024. Therein, Defendants revealed that TAVR growth remained 6% year-over-year for the quarter. Defendants stated that "[H]ospitals and physicians continue to acknowledge heart team capacity constraints." During an earnings call that Edwards hosted on the same day, Defendant Ullem noted that its revised 5% to 7% TAVR growth for 2024 "assume[d] fourth quarter year-over-year TAVR growth below" that range.

101. On December 4, 2024, Edwards hosted an investor meeting. During that meeting, Defendant Wood spoke, among other things, about Edwards' TAVR performance in 2024. In particular, Defendant Wood acknowledged that in 2024,

---

[5] Market Rebellion, *Another #PalmsOut momentEdwards Lifesciences*, https://www.youtube.com/watch?v=NqSPoE9XWPw.

"we saw TAVR growth slow." Defendant Wood attributed the decline specifically to hospital capacity. Defendant Wood explained, "One of the things that's been driving the growth of TAVR has been our ability to add centers and to add capacity to the system. And every time we add centers, it just creates more capacity. The national coverage decision now has limitations on that, and we've sort of hit the peak of that, which is about 850 centers."

102. During this December 4 investor meeting, Edwards also had Michael J. Mack, the Medical Director of Cardiothoracic Surgery of Baylor Scott & White Health, speak to investors about the capacity constraints Edwards experienced relating to TAVR sales. Confirming what Defendants knew throughout the Class Period, Mack explained that from the perspective of a hospital, TAVR capacity is "limited by the number of licensed beds … by clinical space and time available for clinics … by imaging capacity, not enough CT scanners … [and by] the growth of other structural heart procedures."

103. On February 11, 2025, Edwards published a press release filed with the SEC on Form 8-K announcing its financial results for the fourth quarter of 2024 and for the full-year ended December 31, 2024. Defendants disclosed that TAVR sales had grown 6% over 2024 on a year-over-year basis—28.6% below the low-end of Defendants' previously projected range, and 50% below the high-end of the same range. Edwards also filed its annual report with the SEC on Form 10-K the same day. Defendants disclosed that gross margins as a percentage of sales for the Company decreased between 2023 and 2024.

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

104. Defendants made materially false and misleading statements and omissions during the Class Period concerning Edwards' TAVR growth prospects and hospital capacity constraints on TAVR growth. Defendants' statements and omissions were materially false and misleading including because Defendants knew

that their representations regarding TAVR growth were unachievable and that hospital capacity constraints were restricting Edwards' TAVR growth.

### 1. <u>Defendants' Material Misstatements And Omissions Concerning TAVR Growth</u>

105. Throughout the Class Period, Defendants repeatedly represented to investors that Edwards' TAVR products would experience 8%-10% growth in 2024.

#### (a) <u>Defendants' Growth Misstatements Published On Edwards' Website Throughout The Class Period</u>

106. Throughout the Class Period, Edwards published on its website Defendants' presentation materials from Edwards' 2023 Investor Conference. This presentation included a slide titled 2024 Sales Outlook containing Defendants' "***8%-10% Constant Currency Growth***" representation. Further, in the same slide, Defendants represented that their growth projection ***already*** took into account "***Competitive product launches***" as a "***headwind***." The slide is reproduced below:



107. The above statements were untrue statements of material fact and/or omitted material facts necessary in order to make them not misleading. Defendants' statements about TAVR growth in 2024 were materially misleading because, in reality, Defendants knew as early as 2023 that TAVR growth was stagnating, including due to hospital capacity constraints. As a result, Defendants knew that TAVR growth could not grow at a rate of 8%-10% in 2024. As set forth herein, former Edwards employees reported that Defendants closely tracked Edwards' TAVR volumes on a daily basis, and that the TAVR volumes Defendants tracked throughout the Class Period did not support 8%-10% growth in 2024. Former employees also confirmed that Defendants knew that the Company's TAVR volume growth had leveled off in 2023. Moreover, former employees confirmed that Defendants closely tracked hospital TAVR capacity, and knew that capacity constraints would limit TAVR growth in 2024, including limits on capacity due to competition from other heart products. Indeed, Defendants admitted on July 24, 2024 that Edwards' TAVR growth was limited by multiple factors, including hospital capacity constraints and other products. Further, among other things, Defendants' above statements were misleading half-truths that omitted critical qualifying information regarding declining TAVR growth and the negative impact of hospital capacity constraints.

**(b) <u>February 6, 2024 Growth Misstatements</u>**

108. On February 6, 2024, Defendants published a press release filed with the SEC on Form 8-K announcing Edwards' financial results for the fourth quarter of 2023. The press release included quotes from Defendant Zovighian. In the press release, Defendants told investors that they continued to project 8%-10% growth for Edwards' TAVR segment in 2024 (repeating their December 2023 guidance). Indeed, Defendants specifically assured investors that they were "***confident in the sales guidance [they] provided at the December 2023 investor conference for all product groups***," which included Defendants' projection of 8%-10% growth for

Edwards' TAVR segment in 2024. In addition, Defendants reiterated to investors in this press release that they were "***[c]onfident in 2024 guidance of 8 to 10 percent constant currency growth***" and "***[t]he company remains confident that the future of TAVR remains strong driven by an increased focus on patient activation … as well as indication expansion and increased global adoption***."

109. Also on February 6, 2024, Edwards hosted an earnings call to discuss its financial results for the fiscal year ending December 31, 2023. Each of the Executive Defendants were present and spoke during this call. During the call, Defendant Ullem stated that Defendants were "***maintaining all of our previous sales guidance ranges for 2024***," which included Defendants' projection of 8%-10% growth for Edwards' TAVR group in 2024.

110. The above statements were untrue statements of material fact and/or omitted material facts necessary in order to make them not misleading. Defendants' statements about TAVR growth in 2024 were materially misleading because, in reality, Defendants knew as early as 2023 that TAVR growth was stagnating, including due to hospital capacity constraints. As a result, Defendants knew that TAVR growth could not grow at a rate of 8%-10% in 2024. As set forth herein, former Edwards employees reported that Defendants closely tracked Edwards' TAVR volumes on a daily basis, and that the TAVR volumes Defendants tracked throughout the Class Period did not support 8%-10% growth in 2024. Former employees also confirmed that Defendants knew that the Company's TAVR volume growth had leveled off in 2023. Moreover, former employees confirmed that Defendants closely tracked hospital TAVR capacity, and knew that capacity constraints would limit TAVR growth in 2024, including limits on capacity due to competition from other heart products. Indeed, Defendants admitted on July 24, 2024 that Edwards' TAVR growth was limited by multiple factors, including hospital capacity constraints and other products. Further, among other things, Defendants' above statements were misleading half-truths that omitted critical

qualifying information regarding declining TAVR growth and the negative impact of hospital capacity constraints.

**(c) <u>April 25, 2024 Growth Misstatements</u>**

111. On April 25, 2024, Defendants published a press release filed with the SEC on Form 8-K announcing Edwards' financial results for the first quarter of 2024. The press release included quotes from Defendant Zovighian. In the press release, Defendants explained that despite experiencing only 6% TAVR growth in the first quarter of 2024, Defendants "***expect[ed] higher year-over-year second-half growth rates than in the first and second quarters***" for TAVR. Defendants also stated that they "***remain[ed] confident in TAVR sales growth of 8 to 10% on a constant currency basis***" and were "***confident in TAVR guidance***." Further, Defendants stated that "***Edwards is positioned for healthy and sustainable TAVR growth well into the future*** driven by the company's development of differentiated TAVR technologies, a deep commitment to advancing patient care through high-quality clinical evidence, and its investment in patient activation initiatives."

112. Also on April 25, 2024, Defendants hosted an earnings call to discuss Edwards' financial results for the first quarter of 2024. Each of the Executive Defendants was present and spoke during this call. During the call:

a. Defendant Zovighian stated, "***We remain confident in our full year TAVR sales growth of 8% to 10%***. We expect a higher year-over-year second half growth rate than in the first and second quarters."

b. Defendant Zovighian also reiterated, "So we knew when we put together guidance for the year, the TAVR guidance, 8% to 10%, we knew that the [TAVR] growth would ramp throughout the year and that Q1 will be our lowest growth quarter. ***So we feel we are confident about our 8% to 10% [TAVR growth]***."

c. In response to a question from an analyst concerning "why [Defendants] expect TAVR growth to accelerate in the second half,"

> Defendant Wood stated, "We do expect TAVR procedures to ramp. ***That's always been a part of our plan, and so we continue to expect that to happen***. … We were happy with the ramp in Q1. So I think we do expect to see an increase in Q2 over Q1. But even with that, we expect the second half to have a higher growth rate than the first half. So I think that that's good."

113. The above statements were untrue statements of material fact and/or omitted material facts necessary in order to make them not misleading. Defendants' statements about TAVR growth in 2024 were materially misleading because, in reality, Defendants knew as early as 2023 that TAVR growth was stagnating, including due to hospital capacity constraints. As a result, Defendants knew that TAVR growth could not grow at a rate of 8%-10% in 2024. As set forth herein, former Edwards employees reported that Defendants closely tracked Edwards' TAVR volumes on a daily basis, and that the TAVR volumes Defendants tracked throughout the Class Period did not support 8%-10% growth in 2024. Former employees also confirmed that Defendants knew that the Company's TAVR volume growth had leveled off in 2023. Moreover, former employees confirmed that Defendants closely tracked hospital TAVR capacity, and knew that capacity constraints would limit TAVR growth in 2024, including limits on capacity due to competition from other heart products. Indeed, Defendants admitted on July 24, 2024 that Edwards' TAVR growth was limited by multiple factors, including hospital capacity constraints and other products. Further, among other things, Defendants' above statements were misleading half-truths that omitted critical qualifying information regarding declining TAVR growth and the negative impact of hospital capacity constraints.

**(d) <u>June 5, 2024 Growth Misstatements</u>**

114. On June 5, 2024, Edwards hosted an analyst call during the Jefferies Global Healthcare Conference. Defendant Ullem spoke on behalf of Edwards.

During the call, Defendant Ullem stated, "TAVR, we started out in the first quarter with lower year-over-year growth rate than we expect for the full year. ***Our guidance for TAVR for the year is 8% to 10%. We always knew that the first half of the year was going to be a lower year-over-year growth environment than the second half of the year. That's been our plan, and we saw that in the first quarter again.***"

115. The above statements were untrue statements of material fact and/or omitted material facts necessary in order to make them not misleading. Defendants' statements about TAVR growth in 2024 were materially misleading because, in reality, Defendants knew as early as 2023 that TAVR growth was stagnating, including due to hospital capacity constraints. As a result, Defendants knew that TAVR growth could not grow at a rate of 8%-10% in 2024. As set forth herein, former Edwards employees reported that Defendants closely tracked Edwards' TAVR volumes on a daily basis, and that the TAVR volumes Defendants tracked throughout the Class Period did not support 8%-10% growth in 2024. Former employees also confirmed that Defendants knew that the Company's TAVR volume growth had leveled off in 2023. Moreover, former employees confirmed that Defendants closely tracked hospital TAVR capacity, and knew that capacity constraints would limit TAVR growth in 2024, including limits on capacity due to competition from other heart products. Indeed, Defendants admitted on July 24, 2024 that Edwards' TAVR growth was limited by multiple factors, including hospital capacity constraints and other products. Further, among other things, Defendants' above statements were misleading half-truths that omitted critical qualifying information regarding declining TAVR growth and the negative impact of hospital capacity constraints.

### 2. <u>Defendants' Material Misstatements And Omissions Concerning Capacity Constraints Restricting TAVR Growth</u>

116. During the Class Period, Defendants assured investors that they had not experienced capacity constraints that could impact TAVR growth. Defendants made

these statements despite knowing or recklessly disregarding that hospital capacity was not growing meaningfully before or during the Class Period, and that hospital centers were choosing alternative transcatheter heart products over Edwards' TAVR products.

117. As noted above, throughout the Class Period, Edwards published on its website presentation materials from Edwards' 2023 Investor Conference. Therein, Edwards included a slide titled 2024 Sales Outlook, which presented Defendants' "8%-10% Constant Currency Growth" representation and claimed that "***Improving healthcare system capacity***" was a "***tailwind***" for TAVR sales growth in 2024. The slide is reproduced in full *supra* in ¶¶45, 106.

118. The above statement was an untrue statement of material fact or omitted material facts necessary in order to make it not misleading. As set forth herein, Defendants closely tracked hospital TAVR capacity, and knew that capacity constraints were already limiting, and would continue to limit, TAVR growth in 2024. As such, Defendants knew when this statement was made that healthcare system capacity for TAVR was not improving and was not a tailwind for TAVR growth. Indeed, a former Edwards employee reported that Edwards leadership internally characterized hospital capacity constraints as a "headwind"—the opposite of a tailwind. Further, Defendants admitted on July 24, 2024 that TAVR growth was limited by "all the things that have shown up that are going to the same Structural Heart team at all of these hospitals," including Edwards' own EVOQUE product and other companies' transcatheter products. Likewise, Defendant Chopra admitted that the capacity constraints that caused Edwards' TAVR growth to stagnate was "the cumulative effect of all of these things that have played out over time." Moreover, among other things, Defendants' above statement was a misleading half-truth that omitted critical qualifying information regarding declining TAVR growth and the negative impact of hospital capacity constraints.

119. During the April 25, 2024 earnings call, Defendants Wood, Chopra, and Zovighian each assured investors that there were no capacity concerns impacting TAVR growth. For example:

a. One analyst specifically asked Defendants to "talk a little about the launch of EVOQUE and the activity that that drives in some of your major centers" and how Edwards "manag[es] those activity levels or the bandwidth of those centers versus the continuing volumes that they perform in TAVR?" Defendant Wood responded, "[t]his is kind of like what Daveen and I do every day," we "partner very closely on these sorts of things" and "as we roll out these new therapies, we want to ***make sure that people do it with the right volume***."

b. Defendant Chopra supplemented that response, assuring investors, "So for us overall, I don't necessarily believe that the EVOQUE procedures, for any time in the near future, ***are going to affect overall capacity***."

c. Defendant Zovighian reiterated, "What it is fair to say is that so far, we have ***not faced a big challenge in term of the centers having a lack of capacity to be able to treat patients, whether TAVR patients or EVOQUE patients***."

120. The above statements were untrue statements of material fact or omitted material facts necessary in order to make them not misleading. As set forth herein, Defendants closely tracked hospital TAVR capacity, and knew that capacity constraints were already limiting, and would continue to limit, TAVR growth in 2024. As such, Defendants knew when this statement was made that healthcare system capacity for TAVR was not improving and was a challenge for TAVR growth. Indeed, a former Edwards employee reported that Edwards leadership internally characterized hospital capacity constraints as a "headwind." Further, Defendants admitted on July 24, 2024 that TAVR growth was limited by "all the things that have shown up that are going to the same structural heart team at all of

these hospitals," including Edwards' own EVOQUE product and other companies' transcatheter products. Likewise, Defendant Chopra admitted that the capacity constraints that caused Edwards' TAVR growth to stagnate was "the cumulative effect of all of these things that have played out over time." Moreover, among other things, Defendants' above statements were misleading half-truths that omitted critical qualifying information regarding declining TAVR growth and the negative impact of hospital capacity constraints.

## VIII. ADDITIONAL ALLEGATIONS OF SCIENTER

121. Defendants acted with scienter in that they knew that the public statements set forth above were materially false and misleading when made and omitted material facts necessary to make the statements not misleading. The facts set forth herein, considered collectively, demonstrate a strong inference that Defendants each knew facts making the statements they made materially false and misleading. In conjunction with and in addition to the facts set forth above, Defendants' scienter is evidenced by the facts summarized below.

122. **First**, Defendants knew that TAVR sales could not grow at 8%-10% in 2024. As set forth herein, former Edwards employees reported that Defendants closely tracked Edwards' TAVR volumes on a daily basis, and knew that the Company's TAVR volume growth had leveled off in 2023, and that the TAVR volumes Defendants tracked throughout the Class Period did not support 8%-10% growth in 2024.

123. **Second**, Defendants admitted that they worked closely with hospital centers to monitor hospital capacity and repeatedly spoke to investors about hospital capacity. For example, on December 7, 2023, when Defendants first announced that TAVR would grow by 8% to 10% in 2024, Defendant Wood answered a question from an analyst about capacity headwinds for 2024, and how that could be affected by the surgical technology growth. Wood stated, "as these new technologies come forward, one of the things Daveen [Chopra] and I partner on really closely is trying

to work with hospitals to understand what the capacity needs are, if they want to be leaders in these new therapies and the things that they're going to have to do. A leader in the TAVR program right now wants to be the leader in both [TAVR and surgical], he's going to have to get a second team up to speed on TAVR." Indeed, according to FE-5, Defendant Chopra insisted that when physicians would visit Edwards, many of whom performed overlapping TAVR, EVOQUE, and PASCAL procedures, the physicians would spend 30 minutes meeting with Defendant Chopra. The agendas for such visits would set out which of the overlapping procedure teams each physician was meeting with during the site visit.

124. Similarly, during the April 24, 2024 investor conference, Defendant Wood was asked about the "bandwidth" of "major [TAVR] centers" to manage "the launch of EVOQUE" with "the continuing volumes that they perform in TAVR." Defendant Wood responded, "This is kind of like what Daveen [Chopra] and I do every day. We partner very closely on these sorts of things." Defendant Chopra added that "[W]e collaborate very well together to ensure that when we're opening up a center, working with a center for the first time, we are working with that center to ensure that they do have capacity to then adding these incremental procedures."

125. Furthermore, as stated above at ¶¶53-54 and ¶119, Defendants repeatedly made affirmative representations about their observations as to hospital capacity to handle TAVR growth in addition to the EVOQUE ramp-up and other procedures competing for transcatheter lab resources.

126. Relatedly, Defendants knew from their experience during COVID that hospital capacity constraints directly and negatively impacted TAVR sales growth. Indeed, as noted above in ¶42, Defendants repeatedly acknowledged that hospital capacity constraints were, for example, "key headwinds" to growth and "hospital staffing constraints" impacted TAVR procedure volumes.

127. **Third**, Edwards' success (or failure) hinged almost entirely on the success of TAVR, which was its core product and major revenue generator. Indeed,

TAVR sales contributed 65% of Edwards' revenue in each of 2021, 2022 and 2023, TAVR was Edwards' most important product, and Defendants admitted it was their main focus. For example, Defendant Zovighian told investors during the April 25, 2024 investor call that "TAVR, for sure it is the largest business for us. It's still our number one focus." The core significance of Edwards' TAVR business to the Company's success further strengthens the already strong inference of Defendants' scienter.

128. **Fourth**, at the same time they were touting TAVR's projected growth to investors, Defendants confidentially carried out plans for three acquisitions of companies with alternative therapies to TAVR. First, two weeks before Defendants revealed their disappointing TAVR growth, they announced the acquisition of Innovalve, an early-stage transcatheter mitral valve replacement company. Then, on the same day of the corrective disclosure (July 24, 2024), Edwards announced two additional acquisitions, of JenaValve and Endotronix. Defendants, knowing that capacity issues were hampering TAVR growth and realizing the projected revenues would not materialize, sought alternative therapies to invest in to compensate for the decline in TAVR growth. Completion of three acquisitions is a time-consuming process and supports that Defendants knew TAVR growth was declining months before they revealed the truth to investors. Indeed, in announcing the final two acquisitions on the last day of the Class Period, Defendant Zovighian confirmed that "discussions with the companies ha[d] been ongoing for some time."

129. **Fifth**, Defendant Zovighian's insider stock sale during the Class Period further contributes to the already strong inference of his scienter. At the same time Defendants were issuing materially false and misleading statements and omissions to investors—but before the truth was revealed to investors—Defendant Zovighian sold 8,617 shares of his Edwards common stock at the artificially inflated price of $87.68 per share, which generated for him illegal insider trading proceeds of

***$755,539***. Defendant Zovighian sold these shares on May 30, 2024,[6] after Defendants issued several misleading statements and omisisons concerning their "confidence" in Edwards' projected 8-10% growth in TAVR sales for 2024, and after Defendant Zovighian personally assured investors that "we have not faced a big challenge in terms of the centers having a lack of capacity to be able to treat patients, whether TAVR patients or EVOQUE patients." By comparison, Defendant Zovighian sold ***zero shares*** in the 169 days directly preceding the Class Period.

130. **Sixth**, Defendants had a significant financial incentive to promote Edwards' TAVR growth to investors to keep the Company's stock price inflated. Indeed, as explained above, Defendants' compensation packages were heavily weighted towards stock-based incentives, including valuable stock options, restricted stock units (RSUs), and performance-based restricted stock units (PBRSUs). Thus, rather than acknowledge that TAVR sales growth had tapered off due to hospital capacity constraints in Q1 2024, Defendants were incentivized to deceive investors by maintaining their growth projections in Q1 2024 despite slowed sales in the hope that they could avoid a stock price decline and later ramp up growth to cover the Q1 shortfall. The fact that Defendants had a direct financial incentive to tout TAVR growth in 2024 strengthens the inference of scienter.

## IX. LOSS CAUSATION

131. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Edwards common stock and operated as a fraud or deceit on Class Period

---

[6] Defendant Zovighian sold these shares pursuant to a Rule 10b5-1 trading plan that was adopted during the Class Period on February 29, 2024, after Defendants had already made false and misleading statements resulting in Edwards' stock price being artificially inflated, which eliminates any sanitizing effect of the purported plan. *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068-69 (C.D. Cal. 2008) (citing class period amendments to defendant's 10b5-1 plan as probative of scienter for 10(b) claim).

purchasers of Edwards common stock. Defendants failed to disclose and misrepresented the adverse facts detailed herein, including that (i) Edwards' TAVR volume had started declining as early as 2023; (ii) TAVR volume data that Defendants tracked throughout the Class Period indicated that Edwards' TAVR sales would not grow at rates close to 8%-10%; (iii) hospital capacity constraints precluded additional TAVR sales growth; and (iv) hospitals were choosing to dedicate their limited resources to other procedures that were more time- and cost-efficient.

132. As a result of Defendants' misrepresentations and omissions, the price of Edwards common stock declined significantly as the prior artificial inflation came out of the Company's stock price on July 24, 2024.

133. Specifically, on July 24, 2024, in connection with Edwards' second quarter 2024 (Q2 2024) financials, Defendants surprised investors by announcing "lower-than-expected growth in TAVR." Defendants disclosed that Q2 2024 TAVR sales experienced only 6% growth "year-over-year," which was lower than the projections that Defendants had repeatedly provided to investors. Defendants also slashed Edwards' full-year 2024 revenue guidance for the TAVR platform, with the Company "now anticipat[ing] second half TAVR sales growth similar to the first half year-over-year growth rate, 5% to 7% full year growth," down 25% from the 8% to 10% growth that Defendants had forecasted and repeatedly emphasized to investors.

134. Further, in the evening on July 24, 2024 after trading hours, Defendants held an earnings call, in which Defendants Zovighian, Wood, Ullem, and Chopra participated. During the call, Defendants attributed the dramatic slowing of TAVR growth to hospital capacity issues.

135. The market reaction to Defendants' disclosures was swift and severe. Analysts were shocked. For example:

a. Barclays analysts wrote "Mgmnt surprised investors with slower Q2 sales … rais[ing] investor concern over sustainable growth."

b. UBS analysts wrote "TAVR Deceleration drives sales miss," which was "below even our somewhat conservative expectations" and has "shake[n] our confidence" in Edwards.

c. Canaccord Genuity analysts lowered their price target, noting that "[t]he miss in Edwards' core business certainly concerned investors, evident by the stock price movement after the close and the volume of TAVR questions during the conference call."

d. J.P. Morgan analysts reduced their rating of Edwards, slashed their price target, and highlighted that the revelation of "TAVR growth decelerating" forced them to cut predicted growth for the Company in 2025 and 2026 because they "don't expect a quick rebound" for Edwards.

136. In addition, the suspicious timing of Defendants' acquisitions was not lost on the market. As one analyst noted, ***"[w]hen a growth company announces a series of acquisitions as its key product begins to slow, it increases the doubt if the TAVR market is as strong as management had previously discussed***."

137. Due to Defendants' July 24, 2024 disclosures, Edwards' stock price plummeted, nosediving by $27.25 from a closing price of $86.95 per share on July 24, 2024 to $59.70 per share on July 25, 2024 on heavy trading volume. This ***precipitous 31.34% decline wiped out $16.4 billion in shareholder value in a single day***, the largest such decline in the Company's history. To date, Edwards' stock has not recovered.

138. As a result of their purchases of Edwards common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' misstatements and omissions were the proximate cause of the stock price decline and the losses suffered

by Class members. Defendants' materially false and misleading statements caused Edwards common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $95.56 per share on March 28, 2024.

139. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Edwards' business and prospects. As true facts about the Company were revealed to the market, the price of Edwards common stock fell significantly. This decline removed the inflation from the price of Edwards common stock, causing real economic loss to investors who had purchased Edwards common stock during the Class Period.

140. The decline in the price of Edwards common stock after the corrective disclosure came to light was a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Edwards' common stock negates any inference that the losses suffered by Lead Plaintiffs and the other Class members was caused by other factors such as changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

141. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Edwards common stock and the subsequent significant decline in the value of Edwards common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## X. PRESUMPTION OF RELIANCE

142. The Class is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Edwards' common stock was efficient for the following reasons, among others:

a. Edwards' stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. Edwards' common stock traded at high weekly volumes;

c. As a regulated issuer, Edwards filed periodic reports with the SEC;

d. Edwards was eligible to file registration statements with the SEC on Form S-3;

e. Edwards regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

f. Edwards was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. These reports were publicly available and entered the public marketplace;

g. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Edwards common stock; and

h. Lacking any knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the class purchased or acquired Edwards common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

143. As a result of the foregoing, the market for Edwards' common stock reasonably promptly digested current information regarding Edwards from all publicly available sources and reflected such information in the price of Edwards' common stock. All purchasers of Edwards common stock during the Class Period suffered similar injury through their purchase of Edwards common stock at artificially inflated prices, and a presumption of reliance applies.

144. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which Defendants had a duty to disclose. Because this action involves Defendants' failure to disclose slowed growth in TAVR sales that rendered Edwards' 8-10% TAVR sales growth in 2024 not possible—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material, *i.e.,* that a reasonable investor might have considered the omitted facts important in making investment decisions. Given the importance of TAVR sales growth to Edwards, as set forth above, that requirement is satisfied here.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

145. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to the false and misleading statements set forth herein.

146. To the extent that any of the materially false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail above (*see* Sections V.3, VII, and VIII *supra*), then-existing facts known to Defendants contradicted their statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by Defendants was insufficient to insulate Defendants from liability for their materially untrue and misleading statements.

147. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for

those forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and the statement was authorized or approved by an executive officer of Edwards who knew that the statement was false or misleading when made.

## XII. CLASS ACTION ALLEGATIONS

148. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Edwards' common stock from February 6, 2024 through July 24, 2024, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company during the Class Period, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

149. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Edwards common stock was actively traded on the NYSE. As stated in the Company's March 26, 2024 proxy materials, there were 601,768,320 shares of Edwards common stock outstanding as of February 29, 2024. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members of the Class. Class members who purchased Edwards common stock may be identified from records maintained by Edwards or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

150. Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

151. Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Plaintiffs have no interests that conflict with the interests of the Class.

152. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a. Whether Defendants' material misrepresentations and omissions as alleged herein misled investors;

b. Whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

c. Whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

d. Whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss;

e. Whether the members of the Class have sustained damages; and

f. What is the proper measure of damage suffered by members of the Class.

153. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a), (b), and (c) Promulgated Thereunder (Against All Defendants)

154. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

155. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), (b), and (c) promulgated thereunder by the SEC.

156. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Defendants' scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Edwards common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Edwards' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

157. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to and did influence the market for

Edwards' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

158. By virtue of their positions at the Company, the Executive Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class. In the alternative, they acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

159. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Executive Defendants had knowledge of the details of Edwards' internal affairs.

160. The Executive Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Executive Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Executive Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Edwards' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Edwards' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise

acquired Edwards' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

161. Accordingly, Defendants are liable under Section 10(b) and SEC Rule 10b-5(b) for all materially false and misleading statements and omissions made during the Class Period, as alleged herein.

162. Defendants are also liable under SEC Rules 10b-5(a) and (c) for engaging in deceptive and manipulative acts in a scheme to defraud investors. As part of their scheme to defraud investors in violation of SEC Rules 10b-5(a) and (c), Defendants actively suppressed data demonstrating that Edwards TAVR volumes were declining and TAVR sales growth was stalling.

163. During the Class Period, Edwards' common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Edwards' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Edwards' common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Edwards' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

164. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

165. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act (Against The Executive Defendants)

166. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

167. During the Class Period, the Executive Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Edwards' misstatements and omissions as alleged herein.

168. As officers and/or directors of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Edwards which had become materially false or misleading.

169. Because of their positions of control and authority as senior officers, the Executive Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Edwards disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Executive Defendants exercised their power and authority to cause Edwards to engage in the wrongful acts complained of herein. The Executive Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in

the unlawful conduct alleged which artificially inflated the market price of Edwards' common stock.

170. Each of the Executive Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Executive Defendants had the power to direct the actions of, and exercised the same to cause Edwards to engage in the unlawful acts and conduct complained of herein. Each of the Executive Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

171. By reason of the above conduct, the Executive Defendants and/or Edwards are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**COUNT III**

**For Violations of Section 20A of the Exchange Act**
**(Against Defendant Zovighian)**

172. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

173. This count is asserted for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 on behalf of Plaintiffs and all other members of the Class who purchased shares of Edwards common stock contemporaneously with the sale of Edwards common stock by Defendant Zovighian while he was in possession of material, nonpublic adverse information as alleged herein, including concerning Edwards' TAVR growth leveling off prior to and during the Class Period, and hospital capacity constraints that rendered Edwards' TAVR growth projections not possible.

174. Section 20A of the Exchange Act provides that:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

175. As set forth herein, Defendant Zovighian violated §10(b) of the Exchange Act, Rule 10b-5 and §20(a) of the Exchange Act for the reasons set forth in Counts I and II above. Additionally, Defendant Zovighian further violated §10(b) of the Exchange Act, Rule 10b-5, and Rule 10b5-1 (17 C.F.R. § 240.10b5-1) by selling shares of Edwards common stock while in possession of material, nonpublic adverse information concerning Edwards' slowed TAVR sales growth, including due to hospital capacity constraints, which information he had a duty to disclose, and which he failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

176. Contemporaneously with Defendant Zovighian's insider sale of Edwards common stock on May 30, 2024, Plaintiff Fort Lauderdale P&F purchased Edwards common stock on May 23, 2024 and June 3, 2024 on a national securities exchange and in an open and efficient market, while Defendant Zovighian was in possession of material, nonpublic adverse information he had a duty to disclose, but failed to disclose, including information concerning Edwards' slowed TAVR sales growth, including due to hospital capacity constraints.

177. Other Class members also purchased shares of Edwards common stock contemporaneously with Defendant Zovighian's insider sale of Edwards common stock on May 30, 2024.

178. Plaintiffs and other Class members have been damaged as a result of the violations of the Exchange Act alleged herein.

179. By reason of the violations of the Exchange Act alleged herein, Defendant Zovighian is liable to Plaintiff Fort Lauderdale P&F and other members of the Class who purchased shares of Edwards common stock contemporaneously with Defendant Zovighian's insider sale of Edwards common stock during the Class Period.

180. Plaintiffs and other members of the Class who purchased contemporaneously with Defendant Zovighian's insider sale of Edwards securities seek disgorgement by Zovighian of profits gained or losses avoided from his transactions in Edwards common stock contemporaneous with Plaintiff Fort Lauderdale P&F and the other members of the Class.

181. This action was brought within five years after the date of the last transaction that is the subject of Defendant Zovighian's violations of Section 20A, and, with respect to the underlying violations of the Exchange Act alleged in this Count and in Counts I and II above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by Defendant Zovighian.

## XIV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

a) Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, and certifying Plaintiffs as the Class representatives;

b) Awarding compensatory damages in favor of Plaintiffs and other Class members against Defendants, jointly and severally, for all damage sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

c) Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable costs and

expenses incurred in this action, including attorneys' fees, expert fees and other costs; and

d) Awarding such equitable or other further relief as this Court may deem just and proper.

## XV. JURY DEMAND

182. Plaintiffs hereby demand a trial by jury.

Dated: March 21, 2025

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
Chloe Jasper (Bar No. 336556)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481
jonathanu@blbglaw.com
chloe.jasper@blbglaw.com

-and-

Salvatore J. Graziano (*pro hac vice* forthcoming)
Jeremy P. Robinson (*pro hac vice*)
Thomas Z. Sperber (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com
thomas.sperber@blbglaw.com

*Counsel for Lead Plaintiffs Louisiana Sheriffs' Pension & Relief Fund and City of Fort Lauderdale Police & Firefighters' Retirement System*