**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
jonathanu@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Counsel for Lead Plaintiffs Louisiana Sheriffs' Pension & Relief Fund and City of Fort Lauderdale Police & Firefighters' Retirement System*

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

DHIMANT PATEL, Individually and on behalf of itself and all others similarly situated,

Plaintiff,

v.

EDWARDS LIFESCIENCES CORPORATION, BERNARD J. ZOVIGHIAN, LARRY L. WOOD, SCOTT B. ULLEM, and DAVEEN CHOPRA,

Defendants.

Case No. 8:24-cv-02221-AH-KES

**LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Judge: Hon. Anne Hwang
Date: September 3, 2025
Time: 1:30p.m.
Courtroom: 7D

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................................................................1

II. SUMMARY OF THE RELEVANT FACTS ..............................4

A. Edwards' TAVR Business, TAVR Growth, And TAVR Competition ......................................................................4

B. Defendants Misleadingly Reaffirmed Their TAVR Growth Projections and Denied The Challenges Posed By Hospital Capacity Constraints ..........................................5

C. Unknown To Investors, Defendants Knew That TAVR Growth Had Stalled, And Hospital Capacity Limits Precluded The Projected Growth ......................................6

D. The Truth Is Revealed: Defendants Admit To Capacity Constraints Impeding TAVR Growth and Slash TAVR Guidance ..........................................................................7

III. RELEVANT LEGAL STANDARDS ........................................8

IV. ARGUMENT ..........................................................................8

A. Defendants Made Materially Misleading Statements To Investors ..........................................................................8

B. Defendants' Misguided Falsity Challenges Fail ..................11

1. The Misstatements Are Not Sanitized By The Safe Harbor ..........................................................................11

2. Defendants' Remaining Falsity Challenges Fail .......................17

C. The Complaint Adequately Alleges Scienter .....................................18

1. Plaintiff Sufficiently Alleges A Strong Inference Of Scienter ..........................................................................19

2. Defendants' Scienter Theory Is Not Credible...........................23

D. The Complaint Adequately Pleads Loss Causation .............................24

E. The Complaint Alleges A §20A Claim Against Defendant Zovighian....................25

V. CONCLUSION....................25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .......... 8, 15

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) .......... 20

*Applestein v. Medivation, Inc.*,
861 F. Supp. 2d 1030 (N.D. Cal. 2012) .......... 17

*Baker v. Twitter, Inc.*,
2023 WL 6932568 (C.D. Cal. Aug. 25, 2023) .......... 14, 16

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .......... 8, 10

*In re BP Prudhoe Bay Royalty Tr. Sec. Litig.*,
2007 WL 3171435 (W.D. Wash. Oct. 26, 2007) .......... 22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .......... 18

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
2019 WL 687795 (N.D. Cal. Dec. 17, 2019) .......... 17

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) .......... 23

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017) .......... 16

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......... 24

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) .......... 8

*In re Fastly, Inc. Sec. Litig.*,
2021 WL 5494249 (N.D. Cal. Nov. 23, 2021) .......... 15

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) .......... 9

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ........................................................................8

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 781 (9th Cir. 2023) ....................................................................14, 15, 18

*In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*,
2025 WL 714171 (C.D. Cal. Mar. 3, 2025).................................................12, 22

*Grossman v. Sin*,
2025 WL 1330087 (C.D. Cal. Mar. 31, 2025).............................................12, 14

*Herron v. Best Buy Stores, LP*,
2013 WL 4432019 (E.D. Cal. Aug. 16, 2013)...................................................18

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005).............................................................14

*Lamartina v. VMware Inc.*,
2023 WL 2763541 (N.D. Cal. 2023) ...............................................................25

*In re Lucid Grp. Inc. Sec. Litig.*,
2024 WL 3745605 (N.D. Cal. Aug. 8, 2024) .....................................................9

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024).....................................................................................9, 10

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ..........................................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)...........................................................................................17

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
2018 WL 6181241 (D. Ariz. Nov. 27, 2018) .............................................*passim*

*Melo v. JAKKS Pacific, Inc.*,
2014 WL 12589334 (C.D. Cal. June 6, 2014)..................................................14

*Middlesex Retirement Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007)...........................................................25

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ............................................................................9

*Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) ........ 24

*Mulderrig v. Amyris*, 492 F. Supp. 3d 999 (N.D. Cal. 2020) ........ 16

*Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020) ........ 24

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ........ 22

*Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) ........ 9

*In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 F. App'x 603 (9th Cir. 2020) ........ 24

*Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634 (9th Cir. Dec. 20, 2024) ........ 19, 22

*Patel v. Axesstel, Inc.*, 2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ........ 23

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) ........ *passim*

*Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014) ........ 18

*Roberts v. Zuora, Inc.*, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ........ 17

*Sanders v. RealReal, Inc.*, 2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ........ 20

*Schueneman v. Arena Pharms, Inc.*, 840 F.3d 698 (9th Cir. 2016) ........ 9, 18

*SEB Investment Management AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113 (N.D. Cal. 2020) ........ 18, 25

*Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017) ........ 9

*In re SVB Fin. Grp. Sec. Litig.*,
2025 WL 1676800 (N.D. Cal. June 13, 2025)....................................................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..............................................................................18, 19, 24

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ....................................................21

*In re Twitter, Inc. Sec. Litig.*,
2021 WL 4166725 (N.D. Cal. Sept. 14, 2021)....................................................13

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009)....................................................................9

*In re Vaxart, Inc. Sec. Litig.*,
576 F. Supp. 3d 663 (N.D. Cal. 2021)...............................................9, 10, 12, 19

*In re VeriFone Holdings, Inc., Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ...............................................................................18

*Weston v. Docusign, Inc.*,
669 F. Supp. 3d 849 (N.D. Cal. 2023).........................................................*passim*

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .............................................................................13

*Yaron v. Intersect ENT, Inc.*,
2020 WL 6750568 (N.D. Cal. June 19, 2020)......................................................20

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*,
738 F. Supp. 3d 1182 (N.D. Cal. 2024)..........................................................14, 15

Court-appointed Lead Plaintiffs, City of Fort Lauderdale Police & Fire Retirement System ("Fort Lauderdale P&F") and Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs," and, together, "Plaintiffs") respectfully oppose Defendants' Motion to Dismiss (ECF No. 54) as set forth below.[1]

## I. INTRODUCTION

This securities action concerns Defendants' misleading statements to investors regarding the growth prospects of Edwards Lifescience's key product, Transcatheter Aortic Valve Replacement ("TAVR") valves. During the Class Period (February 6, 2024 to July 24, 2024), Defendants repeatedly touted their expectation of ***8-10% sales growth for TAVR valves*** in 2024. They also assured investors that limited hospital capacity to preform TAVR procedures, a structural constraint that had restricted TAVR sales growth in the past, was "***not … a big challenge***" and was "***improving***" to the point of being a positive "***tailwind***" for TAVR growth in 2024. Defendants' representations helped them portray Edwards as a company enjoying continued growth in an important product responsible for a majority of its revenues.

Defendants' statements were materially misleading. Defendants knew when they made these statements that TAVR growth had slowed significantly, including due to hospital capacity constraints. As confirmed by multiple reports from former Edwards employees, Defendants knew from closely tracked TAVR sales and volume data that their TAVR growth projections were misleading and could not be achieved in 2024. For example, a former Edwards employee (FE1) who was part of the senior leadership team for U.S. sales reported being present for discussions with Edwards officials that made clear that data, market size, and market dynamics were being misrepresented. FE1 also recounted that Edwards executives knew there were problems with TAVR growth by 2023—long before they were disclosed to

[1] Emphasis is added and internal citations and quotations are omitted. Cites to "¶__" refer to paragraphs in the Amended Consolidated Complaint (ECF No. 52). Cites to "DB" refer to Defendants' Motion to Dismiss (ECF No. 54).

investors—with Salesforce data, run reports, and internal Company calls showing tapering off TAVR volumes and sluggish sales. FE1 also stated that Edwards executives knew prior to the Class Period that the Company would ***not*** be hitting its forecasts. Another former employee (FE3) reported documenting a 20-40% decrease in TAVR volumes between Q42023 and Q12024. Others confirmed that capacity constraints were a significant challenge inhibiting TAVR growth.

Investors learned the truth on July 24, 2024. That day, after months of affirming their TAVR growth guidance and dismissing concerns over hospital capacity limitations, Defendants publicly disclosed that TAVR growth was being inhibited by hospital capacity constraints, including the "continued growth and expansion of structural heart therapies … put[ting] pressure on hospital workflows." Defendants also disclosed that their 2024 TAVR growth guidance had to be slashed by over 25%, from the 8-10% they had repeatedly touted to just 5-7%.

Defendants' revelations shocked the marketplace. They caused Edwards' stock price to plummet by over 31% in a single day—from $86.95 on July 24 to $59.70 on July 25, 2024—the largest such decline in the Company's history. Securities analysts wrote that the TAVR results had "shaken our confidence" in Edwards. In October 2024, Defendants acknowledged that "heart team capacity constraints" continued to plague Edwards' TAVR business. In December 2024, Defendants admitted that the industry had already hit "the peak" of TAVR centers, meaning that hospital capacity would not improve. The stock price did not recover.

In the face of these well-pled allegations, Defendants move to dismiss the entire case on the pleadings. Defendants argue that they did not make a single actionable misrepresentation and, even if they did, it was not with scienter and did not cause any compensable harm to investors. Defendants are wrong.

<u>**First**</u>, Defendants argue that the alleged misrepresentations are forward-looking, opinion, or puffery. These arguments do not withstand scrutiny. To start, Defendants made several representations that are facially statements of historical or

present fact—and are not forward-looking, opinion, or puffery. For example, Defendants told investors that "***so far, we have not faced a big challenge***" from hospital "lack of capacity" and that "healthcare system capacity" was "***improving***" to the point of being a "***tailwind***" for TAVR growth. These statements of past or present fact were misleading when made because, as Defendants eventually admitted and as multiple former employees confirmed, Edwards *was* facing capacity challenges and hospital capacity was not improving or a tailwind. Other statements involved a mix of past, present, and forward-looking aspects—and the law is clear that the past or present facts in such statements are not protected by the safe harbor.

Moreover, even if forward looking, Defendants' statements are not sanitized by the safe harbor because they were not accompanied by meaningful cautionary language. Instead, Defendants included vague, boilerplate corporate catch-alls about "inherently uncertain" estimates or that they "expect to continue to experience adverse effects related to COVID-19 for some time." Plus, Defendants had actual knowledge that their statements were misleading, as confirmed by multiple former employees. These well-pled allegations are accepted as true at this stage. Because their misstatements were made with actual knowledge they were misleading, Defendants' safe harbor, opinion, and puffery arguments fail. *See infra* §IV.A-B.

**<u>Second</u>**, Defendants dispute that they had scienter. As confirmed by multiple former Edwards employees, Defendants knew from closely tracked TAVR procedure volume data that their TAVR growth projections could not be achieved in 2024 and that hospital capacity constraints were restricting TAVR growth. These mutually corroborating reports from former Edwards employees with direct knowledge of the Company's internal operations confirm that Defendants were aware that they were painting a misleading picture of TAVR growth for investors. Plus, Edwards' financial success hinged on TAVR, as it supplied over two thirds of its revenue, which contributes to the strong inference that Defendants were aware of the internal TAVR volume data rendering their statements misleading. This inference is further

strengthened by Defendants' confidential efforts to acquire different, non-TAVR products through corporate acquisitions during the Class Period. In addition, Defendant Zovighian (CEO) sold three-quarters of a million dollars' worth of Edwards' stock when it was artificially inflated by his own and the other Defendants' misleading statements but before the truth was revealed to investors. The Complaint further details that Defendants were motivated to mislead investors and maintain Edwards' stock price so they could profit from their heavily stock-based compensation packages.

Defendants argue that they believed that the "explosive" growth that Edwards' TAVR sales experienced in 2023 would simply continue unabated in 2024. But the Complaint explains that the Company's internal TAVR data showed otherwise, Defendants' acquisition strategy was inconsistent with their professed belief, and Defendants later admitted that hospital capacity issues restricted TAVR growth. Accepting the Complaint's allegations as true and drawing all reasonable inferences in Plaintiffs' favor (as required here), the inference of Defendants' scienter is cogent and at least as compelling as any innocent inference. *See infra* §IV.4.C.1-2.

**Third**, Defendants' remaining arguments fail. They claim that the July 24 disclosure did not reveal fraud but ignore that they admitted having to slash 2024 TAVR guidance due to capacity constraints, which corrected their misstatements on those same topics. Defendants' attacks on Plaintiffs' §20A insider trading claim are also misplaced. The Complaint explains that Zovighian sold based on material, non-public information about stalled TAVR growth due to capacity constraints and that Fort Lauderdale P&F traded contemporaneously with him. *See infra* §IV.E.

Defendants' motion should be denied in full.

## II. SUMMARY OF THE RELEVANT FACTS

### A. Edwards' TAVR Business, TAVR Growth, And TAVR Competition

Edwards is a medical technology company that makes artificial heart valves for patients with cardiovascular diseases. TAVR valves are implanted into patients

through minimally invasive transcatheter procedures. ¶31. Edwards' most profitable business line has long been TAVR, which was responsible for 65% of the Company's annual revenues from 2021 to 2023. ¶33. Defendants' ability to generate sustainable double-digit TAVR growth was essential to the Company's success. ¶35.

Edwards' TAVR valves faced intense competition for scarce hospital capacity. ¶37. In February 2024, the FDA approved Edwards' new EVOQUE product, which increased competition for hospital capacity. *Id*.

During the COVID-19 pandemic, hospital capacity constraints restricted Edwards' TAVR growth as hospitals devoted limited resources to emergency procedures; not elective procedures like TAVR. ¶42. In 2023, after the pandemic subsided, Edwards experienced a rebound in TAVR growth as hospital capacity freed up from purely acute care. ¶43. Edwards' stock price soared, and Defendants reaped the benefits from their heavily stock-based incentive compensation packages. ¶44.

### B. Defendants Misleadingly Reaffirmed Their TAVR Growth Projections and Denied The Challenges Posed By Hospital Capacity Constraints

Throughout the Class Period, Defendants touted to investors that they expected 8%-10% TAVR growth in 2024, which purportedly accounted for "Competitive product launches" as a "headwind," but listed "Improving healthcare system capacity" as a positive "tailwind." ¶¶106-15. Defendants' guidance assured investors that Edwards' post-COVID TAVR growth would continue in 2024. ¶46.

On April 25, 2024, Defendants released their Q1 2024 results, reporting that they had achieved 6% TAVR growth in that quarter.[2] ¶51. However, Defendants re-affirmed their 8-10% TAVR growth guidance for full year 2024 and assured

[2] Defendants assert that TAVR growth in Q1 2024 was 8%. DB 1, 5, 12. But Defendants misleadingly omit that the 8% number was "adjusted for billing days." D. Ex. 2 at 15. Without that adjustment, TAVR sales only grew 6%, as Defendants admitted. ¶51; *see also* https://tinyurl.com/Edwards-Q124-Press-Release ("Q1 TAVR sales grew 6%"). This is further confirmed by Defendants having to assure investors that "growth would ramp throughout the year." ¶52.

investors that the negative Q1 results were according to plan. ¶¶50-52, 56. Defendants also dismissed concerns about limited hospital capacity for TAVR. ¶53. For example, Zovighian stated "so far, we have ***not faced a big challenge in term of the centers having a lack of capacity to be able to treat patients, whether TAVR patients or EVOQUE patients."*** ¶119.

**C. Unknown To Investors, Defendants Knew That TAVR Growth Had Stalled, And Hospital Capacity Limits Precluded The Projected Growth**

Contrary to their repeated assurances to investors, Defendants knew that Edwards' growth in the TAVR market had stalled as early as Q4 2023, and that hospital capacity constraints precluded Defendants' TAVR growth projection for 2024. Reports by multiple former Edwards employees (FEs) with firsthand knowledge from inside the Company confirm that Defendants knew before the Class Period that growth had slowed for Edwards' TAVR valves and that capacity constraints were restricting TAVR growth. ¶¶59-83. For example, one former employee (FE1) reported that Edwards executives withheld and manipulated market data to show purported growth for the Company. ¶¶61, 62. She explained that omitted data demonstrated that TAVR sales had been "sluggish" for a while, the Q1 2024 TAVR numbers were "looking sh*tty," and that TAVR volumes would not pick up in Q2 2024. ¶61. She further explained that Edwards executives tracked the data daily, and such data was used to project procedure volumes for the next 18-24 months. ¶63. Internally, Edwards confirmed that TAVR volumes were "tapering off," and employees discussed this decline in TAVR rates as a red flag. ¶¶64, 81.

FE3, who was responsible for entering TAVR volume data for her region, reported documenting a 20-40% decrease in TAVR volumes between Q4 2023 and Q1 2024. ¶70. The average number of TAVR volumes in her region dropped from 10-15 procedures per week in 2023 to just 8-10 per week in Q1 2024. *Id*. This data was entered into internal TAVR volume reports. *Id.*

FEs also confirmed that Defendants knew that hospitals were opting to use

their limited capacity to do EVOQUE and other procedures that were more efficient and/or generated more revenue for the hospital than TAVR. ¶¶81-84. For example, one FE reported that Defendants learned that hospitals were increasingly choosing products *other* than TAVR during site visits by doctors who were regularly performing multiple transcatheter heart procedures. ¶41, 82. Another FE confirmed that hospital administrators in her region told her they were doing fewer TAVR procedures in Q1 2024 because of hospital capacity constraints. ¶71. Yet another FE recounted internal meetings where Edwards executive leadership characterized hospital capacity constraints as headwinds. ¶73.

Defendants also engaged in confidential negotiations to acquire companies that produced non-TAVR heart products during the Class Period. ¶¶58, 87-89. And Zovighian (CEO) made a suspiciously large stock sale in May 2024 when he sold at a price artificially inflated by Defendants' misrepresentations prior to the truth being revealed. ¶58. He sold no Edwards stock in the equivalent six-month period prior to the Class Period. ¶86.

### D. The Truth Is Revealed: Defendants Admit To Capacity Constraints Impeding TAVR Growth and Slash TAVR Guidance

On July 24, 2024, Defendants shocked investors by announcing "lower-than-expected growth in TAVR." ¶91. Specifically, Defendants disclosed that Q2 2024 TAVR sales experienced only 6% growth year-over-year, which was lower than the projections that Defendants had repeatedly provided to investors during the Class Period. *Id.* Defendants also slashed Edwards' full-year 2024 revenue guidance for the TAVR platform. *Id.* Specifically, Defendants reported that they were "now anticipat[ing] second half TAVR sales growth similar to the first half year-over-year growth rate, 5% to 7% full year growth," which was down 25% from the 8% to 10%

growth that Defendants had repeatedly touted to investors. ¶91.[3]

Defendants attributed the slowing of TAVR growth to hospital capacity issues. ¶¶92-94. Shocked investors ran for cover. ¶99. Defendants' July 24, 2024 disclosures caused Edwards' stock price to plummet by 31% from a closing price of $86.95 per share on July 24, 2024, to $59.70 per share on July 25, 2024 on heavy trading volume. *Id*. This erased $16.4 billion in shareholder value in a single day—the largest decline in the Company's history. Edwards' stock did not recover. *Id*.

## III. <u>RELEVANT LEGAL STANDARDS</u>

Courts evaluating motions to dismiss must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017); *see also In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 698 (9th Cir. 2021) ("[A] court should assume the[] veracity [of the allegations] and then determine whether they plausibly give rise to an entitlement to relief."). A plaintiff "need not prove its case at the outset . . . [but] has to provide a narrative of fraud—facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). At this stage, a court is "not sitting as a trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (reversing dismissal).

## IV. <u>ARGUMENT</u>

### A. Defendants Made Materially Misleading Statements To Investors

A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir.

[3] Defendants claim that they "Met Guidance." DB 6. They mean their downward-revised guidance issued on July 24 after the truth was revealed. It is undisputed that they did not meet their 8-10% TAVR growth guidance.

2008). If an issuer touts positive information, it must also "disclos[e] adverse information that cuts against the positive information." *Schueneman v. Arena Pharms, Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016). "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). "[O]nly if 'reasonable minds' could not disagree that the challenged statements were not misleading should the district court dismiss under 12(b)(6)." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1133-34 (N.D. Cal. 2017). Even "literally accurate" statements "can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Misleading "half-truths" are also actionable. *Macquarie*, 601 U.S. at 263 ("Rule 10b–5(b) ... prohibits omitting a material fact necessary to make the statements made not misleading" and thus "bars ... half-truths").

Plaintiffs allege two categories of misstatements. **First**, Defendants stated that they expected TAVR sales to grow 8%-10% in 2024. ¶¶108-115. Courts routinely sustain similar statements as misleading. *E.g.*, *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004) (revenue growth forecasts actionable where contradicted by data and reports); *In re Lucid Grp Inc. Sec. Litig.*, 2024 WL 3745605, at *13 (N.D. Cal. Aug. 8, 2024) (sustaining statement that company "remain[ed] confident in [its] ability to achieve 20,000 units in 2022"); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 970-73 (N.D. Cal. 2009) (sustaining statements anticipating that margins would improve, that its visibility was "unmatched," and repeatedly raising guidance).

**Second**, Defendants misrepresented that hospital capacity constraints were not a "***a big challenge***" and that "healthcare system capacity" was "***improving***" and a "***tailwind***" for TAVR sales growth in 2024. ¶¶116-20. Courts have found similar statements to be actionable. *E.g.*, *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 670-71, 73 (N.D. Cal. 2021) (sustaining misstatements of production "capacity" to

"manufacture a billion or more [COVID vaccine] doses per year").

The Complaint describes in detail reports from former Edwards employees who explained that Defendants closely tracked Edwards' TAVR volume data on a daily basis, and the data did not support 8%-10% growth in 2024. ¶¶62-64, 113. FE reports also confirm that Defendants knew that the Company's TAVR volume growth had leveled off in 2023, and that the Q1 2024 TAVR numbers were "looking sh*tty." *Id*. Such reports also confirmed that Defendants discussed that TAVR patient enrollment was inconsistent with their growth projections. ¶62. One FE documented in internal reports a 20-40% reduction in TAVR volumes between Q4 2023 and Q1 2024 in her region. ¶70. *See generally* ¶¶57-90.

Moreover, FEs confirmed that Defendants closely tracked hospital TAVR capacity, and knew that capacity constraints would limit TAVR growth in 2024, including due to competition from other products. ¶¶66, 70, 73, 81, 113. One FE who tracked and documented TAVR sales data noted that hospital administrators began prioritizing procedures that were more profitable than TAVR due to staffing and financial constraints. ¶71. Internally, Edwards executives characterized hospital capacity constraints as "headwinds" for the Company's growth—even while they publicly touted them as "tailwinds." *Compare* ¶73 *with* ¶¶45, 117.

At minimum, Defendants' statements about growth and capacity did not disclose the "whole truth"—that, by the Class Period, TAVR growth had stalled, and that capacity restrictions precluded 8%-10% growth in 2024. The omission of this information gave a "reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson*, 527 F.3d at 985; *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) ("Rule 10b–5(b) ... prohibits omitting a material fact necessary to make the

statements made not misleading" and thus "bars ... half-truths").[4]

### B. Defendants' Misguided Falsity Challenges Fail

#### 1. The Misstatements Are Not Sanitized By The Safe Harbor

Defendants argue that "nearly all" of the misstatements are forward-looking and thus immune under the PSLRA safe harbor. DB 8. Defendants are wrong.

**Misstatements Of Past Or Present Fact**. The Complaint includes several misstatements of past or present fact. For example, Defendants told investors that "***so far, we have not faced a big challenge***" from hospital "lack of capacity," and that they "partner very closely" with hospital centers "every day … to make sure that people do it with the right volume." ¶119. These are facially statements about past or present facts. Likewise, Defendants represented that "healthcare system capacity" was "***improving***" to the point of being an existing "***tailwind***" for TAVR growth. ¶117.[5] Again, these statements indisputably concern present facts. Thus, these misstatements are not eligible for safe harbor protection. *See Weston v. Docusign, Inc.*, 669 F. Supp. 3d 849, 874-75 (N.D. Cal. 2023) (finding that statements concerning future demand, revenue, and growth referring to "things that we've seen" and what the company was "not seeing" were not forward-looking).

These statements were misleading because, during the Class Period, Edwards *was* in fact facing capacity challenges and capacity was not improving or a tailwind for TAVR growth. For example, FE2 reported that Edwards' clinical trials were paused because they were at capacity (¶66), FE3 reported documenting a 20-40% decrease in TAVR volumes from 4Q23 to 1Q24, including due to hospital staffing and other constraints (¶¶70, 71), FE4 recounted internal meetings with Edwards

[4] Because the information Defendants knew differed materially from their statements on TAVR growth and capacity, Defendants were "under [a] duty to update investors" (DB 14-15) to correct the misleading impression given to investors.

[5] Defendants are flatly incorrect to label these statements as "pre-class period." DB 7. The Complaint explains that these statements were published on Edwards' website "***throughout the Class Period***." ¶117; *see also* ¶106 (same).

executives where hospital constraints were characterized as headwinds (¶73), and FE5 reported that TAVR sales were declining in part due to lack of capacity (¶81). Defendants even *admitted* on July 24 that TAVR growth stalled during the Class Period due to "***growth in other procedures***" "***taxing***" hospital capacity. ¶¶84, 92.

**Mixed Statements**. Other misrepresentations by Defendants constitute "mixed" statements of past, present, and forward-looking components. In the 9th Circuit, the past and present parts of such mixed statements are not eligible for safe harbor protection. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) (statements of past or current facts not protected when combined with forward-looking statements); *Grossman v. Sin*, 2025 WL 1330087, at *25 (C.D. Cal. Mar. 31, 2025); *Vaxart*, 576 F. Supp. 3d at 671.

An example of such a mixed statement is Defendants' representation that "Edwards ***is positioned*** for healthy and sustainable TAVR growth well into the future." ¶111. The statement begins with a direct reference to Edwards' ***then-current*** position concerning TAVR growth, which is not forward-looking. *E.g.*, *In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*, 2025 WL 714171, at *6 (C.D. Cal. Mar. 3, 2025) (defendant's statement that business was "well positioned" for growth actionable). Similarly, Defendants represented that their 8-10% TAVR growth projection ***already*** took into account "***Competitive product launches***" as a "***headwind***." ¶¶45, 106.

*Quality Systems* is instructive. There, the Ninth Circuit considered whether the defendants' statements promising revenue growth for the coming year premised on assertions of current business conditions were immunized by the safe harbor. The Ninth Circuit held that defendants' statements that "opportunities" for their product "are plentiful," statements predicting "a revenue range of growth of 21% to 24% for the year," and statements that the predictions were "quite conservative" were actionable as mixed statements. *Id.* at 1146. Statements that the market for defendants' products in ambulatory health care facilities were "going to be that way

for a while," were also actionable. *Id.* at 1147. The circuit also held, "Defendants repeatedly told investors that they could rely on predictions of growth in revenue and earnings ***because the current state of QSI's sales pipeline was consistent with, or better than, the state of the pipeline in previous quarters***." *Id.* at 1148.

Similarly, in *Weston v. DocuSign*, the court found that several statements were mixed forward-looking and non-forward-looking statements. For example, in considering the statement "Even as the pandemic subsides and people begin to return to the office, they are not returning to paper. eSignature and the broader Agreement Cloud are clearly here to stay." 669 F. Supp. 3d at 876. The court found that while the second sentence was forward-looking, the first sentence was not. *Id.*

Here, Defendants' misstatements are similar to those held to be actionable in *Quality Systems* and *DocuSign*. Specifically, Defendants re-affirmed TAVR growth guidance by referring investors to their to-date progress and the then-current conditions that Defendants supposedly observed, including "an increased focus on patient activation" and "improving healthcare system capacity." ¶¶108, 117.

Defendants rely heavily on *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021). DB 8. But the statements at issue here more closely resemble those found actionable in *Quality Systems* (investors could rely on growth predictions because the current state of sales was "consistent with, or better than, the state of the pipeline in previous quarters") than the statements *Wochos* (company was "on track" to meet its production goals). *See Quality Sys.*, 865 F.3d at 1143; *Wochos*, 985 F.3d at 1192; *see also In re Twitter, Inc. Sec. Litig.*, 2021 WL 4166725, at *2 (N.D. Cal. Sept. 14, 2021). (*Wochos* and *Quality Systems* courts "reached different results because the nature of the challenged statements was different in each case).

**Inadequate Cautionary Language**. Defendants' misstatements also were not accompanied by adequate cautionary language. "To be adequate, cautionary warnings "must identify 'important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Quality Sys.*, 865 F. 3d at

1148. "Where the cautionary language accompanies a forward-looking portion of a mixed statement, 'that language must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement.'" *Sin*, 2025 WL 1330087, at *31 (quoting *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 781 (9th Cir. 2023)). "Defendants bear the burden of showing their cautionary language was not boilerplate." *Baker v. Twitter, Inc.*, 2023 WL 6932568, at *7 (C.D. Cal. Aug. 25, 2023).

Here, Defendants rely on two categories of purportedly cautionary language. **First**, Defendants argue that they warned investors that their public disclosures "included forward-looking statements" based on "inherently uncertain" estimates. DB 9. These purported warnings are "boilerplate cautionary language" that is insufficient under the PSLRA to warrant safe harbor protection. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1035 (S.D. Cal. 2005). Courts consistently hold that similar language does not trigger safe harbor protection. *Glazer*, 63 F.4th at 779 (statements that timing of closing was "uncertain" not meaningful); *Melo v. JAKKS Pacific, Inc.*, 2014 WL 12589334, at *6 (C.D. Cal. June 6, 2014) ("may contain forward-looking statements…based on current expectations, estimates, and projections" were not meaningful); *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1211 (N.D. Cal. 2024) ("contains forward-looking statements that involve risks, uncertainties and assumptions" not meaningful). Underscoring their inadequacy, these warnings could have applied to any company.

**Second**, Defendants say they cautioned about capacity constraints. For example, Defendants claim that they "warned investors" that "hospitals have ***limited*** capacity to add in … incremental procedures." DB 9. This claim is troubling because the opposite is true. The quoted statement by Defendant Chopra did not warn about ***limited*** capacity but instead claimed that Defendants were "working with [hospital] center[s] to ***ensure that they do have the capacity*** to then add in these incremental procedures." ¶124. Defendants' mischaracterization of the facts cannot suffice.

Defendants also claim they warned that they expected Edwards to continue to "experience adverse effects related to COVID-19," including "hospital systems … budget constraints and staffing shortages … in a post-COVID-19 market." DB 9. But Defendants' generic "adverse effects" statement does not warn investors that capacity constraints were restricting TAVR growth. Moreover, these purported warnings were themselves misleading, including because they "speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021); *see also Glazer*, 63 F.4th at 781 (finding that "cautionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized"). Indeed, Defendants went out of their way to assure investors that such risks ***had not*** materialized. *See, e.g.*, ¶56 (Ullem: COVID was "ancient history"); DB 5-6 (Zovighian: COVID was "in the rearview mirror"). Like *DocuSign*, where warnings of the possibility that the pandemic could impact demand "did not alert investors that some of those risks may have already come to fruition," Defendants' generic disclosures did not warn investors that limited capacity had ***already*** affected TAVR sales. 669 F. Supp. 3d at 879; *Alphabet*, 1 F.4th at 703 (risk disclosures insufficient where defendants warned security vulnerabilities could pose risk but did not disclose existing security risk).[6] Unlike *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *19 (N.D. Cal. Nov. 23, 2021) (DB 9), these warnings do not "enumerate risks … underlying plaintiff's theory of fraud."

Relatedly, Defendants' purported cautionary language did not warn that competition from other transcatheter procedures (including EVOQUE) could

[6] Plaintiff need not have alleged the risk disclosures as misstatements for the Court to find that the warnings were misleading and accordingly not sufficiently meaningful. *See York Cnty.*, 738 F. Supp. 3d at 1210 & n.4.

exacerbate capacity constraints and restrict TAVR growth.[7] Accordingly, "[t]he cautionary language offered by [D]efendants here does not meaningfully address the risks inherent in [Edwards's] projections of future [TAVR sales]." *Mulderrig v. Amyris*, 492 F. Supp. 3d 999, 1023 (N.D. Cal. 2020). Because Defendants have failed to meet their burden of demonstrating that the misstatements were accompanied by meaningful cautionary language, these statements are not protected by the PSLRA safe harbor. *See Twitter*, 2023 WL 6932568, at *7.

**Defendants Had Actual Knowledge Of Falsity**. Defendants also made their statements with actual knowledge that they were misleading. *Quality Sys.*, 865 F.3d at 1149. Unlike scienter, which requires a "strong inference," determinations of actual knowledge for the sake of falsity analysis are subject to the more lenient "plausibility" standard. *Docusign*, 669 F. Supp. 3d at 880 (N.D. Cal. 2023).

As detailed below in §IV.C.1. (Defendants' scienter), Defendants had actual knowledge of the misleading nature of their statements. *DocuSign*, 669 F. Supp. 3d at 880 (actual knowledge where former employees recounted "waning demand in DocuSign products" reflected by data accessible to defendants); *Amyris*, 492 F. Supp. 3d at 1023, n.18 (finding sufficient allegations of actual knowledge of purely forward-looking statements concerning sustainability of revenue growth).

Defendants argue that the FE reports should be rejected because the FEs did not personally prepare TAVR forecasts or have direct contact with Defendants. DB 10. This is a red herring. Plaintiffs have adequately "described with sufficient particularity" the FEs' roles, responsibilities, and personal knowledge, all of which demonstrate that Defendants received reports and tracked data showing declining TAVR sales volumes. *Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017). There is no requirement that FEs prepare the misleading statements or have direct

---

[7] Defendants make the conclusory assertion that the risk EVOQUE could affect TAVR capacity was "no secret." DB 12. Defendants did not disclose such a risk, and instead affirmatively denied it.

contact with Defendants. *E.g.*, *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (FE allegations supported scienter despite no "direct contact" with defendants); *Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 WL 6181241, at *11-12 (D. Ariz. Nov. 27, 2018) (FEs need not have personal knowledge of defendants' state of mind). Even *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.* (DB 10) credited FEs with "personal knowledge." 2019 WL 687795, at *19 (N.D. Cal. Dec. 17, 2019).[8]

**2. Defendants' Remaining Falsity Challenges Fail**

**<u>No Puffery</u>**. Defendants argue that certain misstatements were puffery. DB 2, 13. Puffery determinations are "inherently fact-specific" inquires that are generally inappropriate at the pleading stage. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011). "Thus, in deeming a statement puffery at the motion dismiss stage, courts must exercise great caution." *In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *11 (N.D. Cal. June 13, 2025).

"Even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143; *DocuSign*, 669 F. Supp. 3d at 881. This is true here. Defendants made bullish statements regarding TAVR growth when they knew *inter alia* that TAVR sales were "sluggish" and "looking sh*tty" before and during the Class Period. ¶¶59-84, 121-130; *DocuSign*, 669 F. Supp. 3d at 880-81 (demand statements omitting "decline in product usage" not puffery).

**<u>No Inactionable Opinions</u>**. Defendants also claim that their statements are

[8] Defendants also cite *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1038 (N.D. Cal. 2012) for the proposition that the FE statements were inconsistent and must be rejected. DB 15. The FE accounts here are not inconsistent—they all report that TAVR data demonstrated insufficient growth either before or during the Class Period. *Applestein* is inapposite, as that concerned dueling FE accounts disagreeing on whether an order ***was or was not*** received. 861 F. Supp. 2d at 1038.

inactionable opinions. DB 11-13. This claim is flatly incorrect regarding the statements of current and past facts discussed above. Further, even opinion statements are misleading where, (i) "the speaker did not hold the belief she professed and that belief was objectively untrue"; (ii) a fact contained within an opinion statement was untrue; ***or*** (iii) "facts going to the basis for the issuer's opinion" were omitted, rendering the statement misleading. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017). Only one prong needs to be satisfied. *Id.* at 616.

Defendants' arguments solely concern the first prong of *Align Tech*—so they have waived any arguments on the second or third prongs. *Herron v. Best Buy Stores, LP*, 2013 WL 4432019, at *4 (E.D. Cal. Aug. 16, 2013) (refusing to consider argument that the defendant "failed to squarely raise" in its "dismissal motion"). The Complaint alleges that (at minimum) the third prong of *Align Tech* is satisfied here, as Defendants' statements misleadingly omitted facts they knew regarding stalled TAVR growth and the negative impact of hospital capacity constraints. Thus, Defendants' "concrete assurances did not fairly align with the information in [their] possession at the time." *Glazer*, 63 F.4th at 771 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015)).

**C. The Complaint Adequately Alleges Scienter**

"Scienter can be established by intent, knowledge, or certain levels of recklessness." *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012); see also *Arena*, 840 F.3d at 705 ("deliberate recklessness" suffices). Deliberate recklessness exists when a defendant "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). The standard is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007). A court must

"constantly assum[e] ... plaintiff's allegations to be true." *Id.* at 326-27.

**1. Plaintiff Sufficiently Alleges A Strong Inference Of Scienter**

**Defendants' Knowledge or Recklessness**. Defendants knew, or recklessly disregarded, that Edwards' TAVR volumes were tapering off before or when they made their misstatements. For example, FE1 reported that Edwards executives tracked TAVR volume data on a ***daily*** basis, and were included on ***daily*** emails during the Class Period that depicted the decline in TAVR volume beginning as early as 2023. ¶¶62-63. FE1's boss (the SVP of U.S. Commercial) confirmed that TAVR volumes were "tapering off." ¶64. Similarly, FE2 reported that Zovighian discussed patient enrollment in TAVR programs during regular Town Hall meetings before the Class Period. ¶66. The fact that Defendants had access to and reviewed on a daily basis data showing declining TAVR volumes before and during the Class Period, and discussed TAVR volume during Town Hall meetings, establishes a strong inference of scienter. *E.g.*, *Vaxart*, 576 F. Supp. 3d at 673 (scienter where "document deficiencies hampering the company's" manufacturing prospects were "conveyed to [company] leadership").

Defendants argue that the FE reports do not provide sufficient detail about "when" or "how" the TAVR volume data put Defendants on notice of lagging TAVR sales. DB 21. This is wrong. The FEs reported that the TAVR volume drop-off was reflected in this data as early as 2023, and that the Q1 data was "looking sh*tty" as it was coming in. ¶61. It would be "absurd" to suggest that Defendants had access to data demonstrating that their most important product was not growing in-line with stated expectations, and were not at least reckless in failing to make themselves aware of it. *Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634, at *2-3 (9th Cir. Dec. 20, 2024) (scienter where concealed facts threatened business making up more than half of company's revenue).

FE1's allegations are corroborated by the fact that Edwards only realized 6%

TAVR growth in Q1 2024 (¶51),[9] less than the 8%-10% TAVR sales growth projection. Former employee allegations are afforded more weight with corroboration. *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *11 (N.D. Cal. Nov. 4, 2020) ("When other types of information corroborate the witness statements, such detailed descriptions [of unnamed sources] are not necessary"); *Sanders v. RealReal, Inc.*, 2021 WL 1222625, at *11 (N.D. Cal. Mar. 31, 2021) (relying on former employee accounts that were "corroborated by news reporting").

Plaintiffs also alleges facts demonstrating a strong inference that Defendants knew, or recklessly disregarded, that hospital capacity was worsening and could not support the projected TAVR sales growth. For example, FE2 reported that hospital capacity projections were discussed at regular Town Hall meetings during which Defendants spoke. ¶66. She further reported that hospital constraints limited TAVR growth during the COVID-19 pandemic, and that Edwards executives thus understood that hospital capacity affected TAVR growth. ¶67. Likewise, FE4 recalled internal meetings where Edwards executive leadership characterized hospital capacity constraints as headwinds—in stark contrast to the "tailwinds" Defendants touted to investors. ¶¶73, 117. And FE5 recalled that the pressure of other procedures on TAVR sales was noted in 2023 and raised to Zovighian. ¶81. FE5 observed that Edwards' TAVR growth projections were "very aggressive and borderline unrealistic" in light of the pressure from other products. ¶82.

FE5 also recalled that physicians would visit Edwards and meet with each of the TAVR, EVOQUE, and PASCAL teams—meaning that those physicians were doing all three procedures. ¶83. Zovighian and Chopra were aware of this, as (per FE5) they would meet with each physician during those visits. *Id.*

---

[9] Defendants argue that "TAVR sales grew each Class Period quarter." DB 21. But the issue here is the growth *rate*, which declined during the Class Period, and Defendants' guidance concerning that rate, which proved to be misleading. Thus, *Yaron v. Intersect ENT, Inc.* is inapposite. 2020 WL 6750568, at *8 (N.D. Cal. June 19, 2020) (defendant "met its guidance for most of the Class Period").

Defendants argue that the facts supplied by the FEs are "vague and conclusory" because they are "general discussions" of capacity constraints. DB 20. This is wrong. FEs 2, 4, and 5 reported specific information about which Defendants were present during these meetings and that capacity was discussed as a problem or a "headwind." ¶¶73. Defendants assert that they disclosed that capacity was a "headwind." DB 20. The opposite is true: Defendants maintained throughout the Class Period on Edwards' website that "improving hospital capacity" was a positive "***tailwind***" to TAVR sales growth. ¶¶45, 117, 118.

Defendants also challenge FE5 because she left Edwards before the Class Period. DB 15-16. Courts regularly reject such arguments, holding that a witness need not be employed during the Class Period to be credited. *E.g.*, *Quality Sys.*, 865 F.3d at 1145 (crediting statements from witness who "was not at [the company] during the Class Period"); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *7 (C.D. Cal. Apr. 12, 2016) (that a witness left the company before the class period does not require court to "completely shut its eyes to such allegations").

Defendants' own admissions corroborate the FE accounts. For example, Wood and Chopra told investors that they worked "every day" on "managing … activity levels or the bandwidth of [TAVR] centers" to ensure that new therapies would not constrain capacity for TAVR sales. ¶119. Chopra claimed that this management ensured EVOQUE would not "affect overall capacity" for TAVR "for any time in the near future." *Id.* Defendants eventually admitted that growth in non-TAVR procedures was "taxing" hospital centers' capacity because they wanted "to offer all of the therapies." ¶84. Far from taking "steps to ensure its statements were accurate" (DB 21), Defendants assured investors that they closely monitored and managed capacity, and it was not an issue. Thus, they knew (or should have known) that there was insufficient capacity to support both TAVR growth and new procedures. Such corroboration further strengthens the FE allegations.

Furthermore, as explained by the Former Edwards VP, the nature of TAVR

subjected it to a capacity squeeze. Hospital centers chose to do more efficient procedures over TAVR, and while the number of products grew, "there's not a lot of new centers to go in the market." ¶77. Thus, Defendants (who knew TAVR was time consuming and resource intensive) were at least reckless in not knowing that capacity for TAVR was diminished by newer, more efficient procedures.

Plus, knowing that TAVR growth was declining, Defendants confidentially diligenced and negotiated transactions to acquire non-TAVR companies. Defendants' decision to announce these acquisitions right when they also disclosed the truth about TAVR's lack of expected growth further reinforces that the acquisitions were intended to plug the gap left by TAVR. ¶¶87-90.[10]

**Core Operations**. Edwards' TAVR segment was its main revenue driver, making up 65% of Edwards' revenue in each of 2021, 2022, and 2023. ¶127. During the Class Period, Zovighian confirmed that "TAVR, for sure it is the largest business for us. It's still our number one focus." ¶127. Thus, "it would be 'absurd' to suggest that management was without knowledge of the matter." *Snap*, 2024 WL 5182634, at *2-3; *Golden Heaven*, 2025 WL 714171, at *7 (same). Defendants' suggestion that Plaintiff's core operations allegations are "boilerplate" ignores the details regarding the revenues brought in by TAVR.

**Motive**. Motive allegations are not required for scienter. *In re BP Prudhoe Bay Royalty Tr. Sec. Litig.*, 2007 WL 3171435, at *3 (W.D. Wash. Oct. 26, 2007). Nevertheless, the Complaint includes facts showing motive, which enhance the scienter inference here. For example, Zovighian sold $755,000 worth of Edwards shares in May 2024, and sold ***zero*** shares in the equivalent, preceding control period. ¶¶86, 129. *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003) (stock sales support scienter when

[10] This is not "speculation." DB 22. Analysts even noted that Edwards announcing "a series of acquisitions as its key product begins to slow … increases the doubt if the TAVR market is as strong as management had previously discussed." ¶98.

"dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information").

Defendants' attacks fail. *First*, they argue that Zovighian's sale was subject to a 10b5-1 plan so it is innocent. DB 18. But the 10b5-1 plan was adopted ***during*** the Class Period, and is thus probative of scienter. *E.g.*, *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1068-69 (C.D. Cal. 2008) (class period amendments to 10b5-1 plan probative of scienter). *Second*, Defendants point to Zovighian's sale in May 2023. DB 18-19. But Zovighian's May 2023 sale is beyond the six-month control period, he sold ***more than twice*** as many shares in May 2024 as he did in May 2023, and his May 2023 transactions ***increased*** his net holdings. D. Ex. 7. Zovighian's large and unusual sale in May 2024 demonstrates scienter.

The Complaint also explains that Defendants' compensation was heavily stock-based, which incentivized them to deceive investors about TAVR's growth prospects to keep Edwards' stock price as high as possible. ¶¶44, 130. They concealed the truth to buy time in the hopes that things would work out and to avoid losing millions personally if the stock price tanked. *Id*. That Defendants took a "reckless gamble" that ultimately failed is a well-recognized theory of motive. *See Patel v. Axesstel, Inc.*, 2015 WL 631525, at *13 (S.D. Cal. Feb. 13, 2015) (that gamble failed does not cut against scienter); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (scienter includes "a reckless, gamble").

**2. Defendants' Scienter Theory Is Not Credible**

Defendants argue that they believed that the "explosive growth" Edwards had experienced post-pandemic would simply continue unabated in 2024. DB 6, 23. This inference is contrary to the facts in the Complaint (which are accepted as true) and implausible on its face. As a Former Edwards VP explained, hospital capacity imposed a "natural ceiling" such that "there are limits to growing infinitely forever," particularly because "the number of [TAVR] centers [is] capped." If Defendants believed that the "***explosive*** growth" in 2023 would continue through 2024, they did

so recklessly. Defendants' theory does not "make sense," and *Nguyen v. Endologix, Inc.* is inapposite. 962 F.3d 405, 415 (9th Cir. 2020) (scienter implausible for promise that FDA would approve medical device when defendants allegedly knew it was destined for defeat; noting that insider trading allegations might have lent theory "more legs").

The scienter inference "need not be irrefutable," a "smoking gun," or even the "most plausible of competing inferences"—so a "tie" between competing inferences is resolved in Plaintiffs' favor here. *Tellabs*, 551 U.S. at 324. Because Defendants' proffered scienter inference is not more compelling, it cannot suffice. *See DocuSign*, 669 F. Supp. 3d at 886 (inference of "good faith in unprecedented circumstances" was not more compelling than an inference of scienter).

**D. The Complaint Adequately Pleads Loss Causation**

Loss causation is a "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Pleading loss causation "should not prove burdensome," *id.* at 347, as allegations need only meet "the familiar test for proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Plaintiffs readily satisfy this test.

Defendants mistakenly argue that their July 24 disclosures were not corrective because they revealed only "disappointing … results" and not "fraud." DB 24. Even if that was true (it is not), such a disclosure *can* support loss causation. *First Solar*, 881 F.3d at 753-54 (loss causation for "earnings miss").[11] More fundamentally, the July 24 disclosures revealed "lower-than-expected growth in TAVR" at only 6% and slashed TAVR guidance to "5% to 7%"—well below the 8-10% growth Defendants touted during the Class Period. ¶91. Defendants also admitted that the cause of the TAVR growth decline was the "burden" caused by "growth in other procedures … taxing" hospital capacity—the very thing that Defendants had misleadingly told

[11] *In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 F. App'x 603 (9th Cir. 2020) is inapposite: Plaintiffs adequately pled loss causation even without analyst reactions.

investors was "not a big challenge." ¶¶92-93. Thus, Defendants' July 24 disclosures corrected their misrepresentations during the Class Period.[12]

### E. The Complaint Alleges A §20A Claim Against Defendant Zovighian

Zovighian sold $755,500 worth of stock while he had material, nonpublic information regarding stalled TAVR growth due to capacity constraints. ¶¶86, 176. Fort Lauderdale P&F's June 3 purchase was two trading days after Zovighian's May 30 sale, which is contemporaneous. *Middlesex Retirement Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (8 days contemporaneous).

Defendants repeat their §10(b) arguments, which fail for the reasons set forth above. DB 25. Defendants concede that one purchase by Fort Lauderdale P&F was after Zovighan's May 30 sale—but cite *SEB Investment Management AB v. Align Tech., Inc*. to argue that a plaintiff's purchase at a price lower than a defendant's sale price cannot suffice. 485 F. Supp. 3d 1113, 1136 (N.D. Cal. 2020). They are wrong. *Align Tech* is inapposite because, there, the court found "no indication that the trades occurred with defendant at an unfair advantage." *Lamartina v. VMware Inc.*, 2023 WL 2763541, *19 (N.D. Cal. 2023) (sustaining §20A claim where the defendant "sold stock at a higher price than [the] [p]laintiff's purchase price"). Here, Fort Lauderdale P&F bought shares two trading days after Zovighian sold; at a price artificially inflated by Defendants' misrepresentations; and did so when Zovighian possessed—and sold based on—material, non-public information about declining TAVR growth due to hospital constraints. ¶128. Thus, Plaintiffs have alleged a §20A claim.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied. If the Court grants the motion, Plaintiffs respectfully request leave to amend.

---

[12] Defendants' only basis for challenging Plaintiffs' §20(a) control person claim is that a predicate §10(b) violation is not pled. DB 24, n.6. Defendants are wrong. As set forth above, the Complaint does adequately plead a §10(b) violation.

Dated: July 18, 2025

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481
jonathanu@blbglaw.com

-and-

Salvatore J. Graziano (*pro hac vice* forthcoming)
Jeremy P. Robinson (*pro hac vice*)
Thomas Z. Sperber (*pro hac vice*)
Rebecca S. Temkin (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com
thomas.sperber@blbglaw.com
rebecca.temkin@blbglaw.com

*Counsel for Lead Plaintiffs Louisiana Sheriffs' Pension & Relief Fund and City of Fort Lauderdale Police & Firefighters' Retirement System*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**

Robert D. Klausner
Stuart Kaufman
7080 Northwest Fourth Street
Plantation, Florida, 33315
Tel: (954) 916-1202
Fax: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional counsel for Lead Plaintiffs Louisiana Sheriffs' Pension & Relief Fund and City of Fort Lauderdale Police & Firefighters' Retirement System*

**L.R. 11-6.2 CERTIFICATE OF COMPLIANCE**

I, Jonathan D. Uslaner, counsel of record for Lead Plaintiffs Louisiana Sheriffs' Pension & Relief Fund and City of Fort Lauderdale Police & Firefighters' Retirement System, hereby certify that this brief does not exceed 25 pages, which complies with the page limit set by Court order dated December 20, 2024. ECF No. 40.

Dated: July 18, 2025

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)