UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | 8:24-cv-02221-AH (KESx) | Date | September 19, 2025 |
|---|---|---|---|
| Title | *Dhimant Patel v. Edwards Lifesciences Corporation, et al.* | | |

| Present: The Honorable | Anne Hwang, United States District Judge |
|---|---|

| Yolanda Skipper | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    (IN CHAMBERS) ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [DKT. NO. 54] AND GRANTING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE [DKT. NO. 55]**

Before the Court is a Motion to Dismiss ("Motion") filed by Defendants Edwards Lifesciences Corporation ("Edwards"), Bernard J. Zovighian ("Zovighian"), Larry L. Wood ("Wood"), Scott B. Ullem ("Ullem"), and Daveen Chopra ("Chopra")[1] (collectively, "Defendants"). *See* Mot. to Dismiss ("Mot."), Dkt. No. 54. Lead Plaintiffs Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriff Fund") and City of Fort Lauderdale Police & Firefighters' Retirement System ("Fort Lauderdale P&F") (collectively, "Plaintiffs"), opposed the Motion, *see* Opp'n, Dkt. No. 60, and Defendants replied, *see* Reply, Dkt. No. 62. The Court heard oral argument on September 17, 2025. For the following reasons, the Court **GRANTS in part and DENIES in part** the Motion.

---

[1] Defendants filed a Notice of Errata that Chopra was inadvertently omitted from the caption page, signature block, and definition of "Defendants" in the Motion to Dismiss. *See* Notice of Errata, Dkt. No. 68.

## I.    BACKGROUND[2]

### A.    Factual Background

Edwards, a medical technology company incorporated and headquartered in California, manufactures and sells transcatheter and surgical heart valve products for patients with cardiovascular disease.  FAC ¶ 20.  One heart valve product line is the Transcatheter Aortic Valve Replacement ("TAVR"), which is implanted in a minimally-invasive procedure to treat aortic stenosis, and this TAVR procedure can replace highly invasive methods previously used to treat the disease.  FAC ¶¶ 31–32.  Another is the Transcatheter Mitral and Tricuspid Therapies ("TMTT").  FAC ¶ 31.

TAVR has been Edwards' primary and most profitable business line, amounting to approximately 65% of Edwards' revenues from 2021 to 2023.  FAC ¶ 33.  Plaintiffs allege that Defendants' primary sales pitch to potential investors was and is its ability to "deliver sustainable growth," which necessarily relies on TAVR as Edwards' main product line and profit center.  FAC ¶¶ 34–35.

The TAVR product line is not without competitors.  FAC ¶ 36.  Various other companies, like Medtronic PLC, Abbott Laboratories, and Boston Scientific Corporation, compete with Edwards for a share of the global market of TAVR.  *Id.*  In addition, Edwards' own products, like TMTT, provide competition for TAVR.  FAC ¶ 37.  Although the TAVR and TMTT involve different procedures with different requirements, both procedures are generally performed at the same transcatheter heart center at a given hospital.  *Id.*  This causes competition for hospital capacity between the two Edwards' product lines as hospitals might devote an entire day to either TAVR procedures or TMTT procedures—or to an outside competitor's product.  FAC ¶¶ 37–38, 40.

During the COVID-19 pandemic, the TAVR rate of sales growth declined because hospitals were limited to emergency procedures.  FAC ¶ 42.  In 2023, after

---

[2] All facts stated herein are taken from the allegations in Plaintiffs' First Amended Consolidated Complaint unless otherwise indicated.  First Am. Consol. Compl. ("FAC"), Dkt. No. 52.  For the purposes of this Motion, the Court treats these factual allegations as true, but at this stage of the litigation, the Court makes no finding thereof.

the initial reaction to COVID-19 subsided, elective procedures returned and Edwards' TAVR sales growth rebounded.  FAC ¶ 43.

From February 6, 2024, to July 24, 2024 (the "Class Period"), FAC ¶ 148, Edwards' common stock was traded publicly on the New York Stock Exchange, FAC ¶ 20.  During that time, the individual Defendants worked at Edwards in the following positions:  Zovighian was Chief Executive Officer and Director; Wood was Corporate Vice President and Group President of TAVR and Surgical Heart Structure Therapies; Ullem was Corporate Vice President and Chief Financial Officer; and Chopra was Corporate Vice President of TMTT.  FAC ¶¶ 21–24. Defendants all had stock-based incentive compensation packages.  FAC ¶¶ 43–44.

Just prior to the Class Period, Defendants produced a presentation at Edwards' 2023 Investor Conference which told investors that they projected 8% to 10% net sales growth in the TAVR sector for 2024.  FAC ¶ 45.  This projection took into account "[c]ompetitive product launches" as a headwind but listed "[i]mproving healthcare system capacity" as a tailwind.  *Id.*  This presentation remained published on Edwards' website throughout the Class Period.  *Id.*

During the Class Period, Defendants repeated their projection of 8% to 10% TAVR sales growth for 2024.  FAC ¶¶ 49–56.  For example, on February 6, 2024, Ullem told investors that Edwards was "maintaining" its "previous sales guidance range[]" for TAVR of 8% to 10%.  FAC ¶ 49.  Defendants maintained this sales guidance in a Q1 2024 earnings release.  FAC ¶ 51.  On April 25, 2024, Zovighian advised investors that Defendants were "confident about [their] 8% to 10%" projection and denied concerns about slow Q1 2024 growth.  FAC ¶ 52.  Wood affirmed Zovighian's statements, assuring investors that Defendants "always" "expected" lower growth in Q1, but "expect[ed] to see an increase in Q2 over Q1." *Id.*

Moreover, Defendants dismissed concerns about hospital capacity for TAVR. FAC ¶ 53.  Zovighian stated, in response to an analyst question about hospital capacity, that Edwards had not experienced "the centers having a lack of capacity to be able to treat patients" for either TAVR or EVOQUE (a product in the TMTT line).  FAC ¶ 53.  And Defendants asserted that they closely tracked hospital capacity, such as when Wood explained that he and Chopra worked with transcatheter hospital centers on capacity "every day" and that they "partner very closely" on capacity.  FAC ¶ 54.  Wood stated that this is "a key part of when we

start centers, making sure that they have a whole program that encompasses their entire structural heart patient population." *Id.*

Defendants continued to reiterate their 8% to 10% projections at analyst conferences from June 5 through June 6, 2024. FAC ¶ 56. Ullem assured investors that the capacity constraints Edwards experienced during the COVID-19 pandemic were "ancient history now." FAC ¶ 56.

But Plaintiffs allege that Defendants were aware that their TAVR growth projections would not be achieved, contrary to their representations to investors. FAC ¶ 57. Plaintiffs allege that five former Edwards employees[3] reported that Defendants knew before the Class Period (and as early as Q4 2023) that growth had slowed for Edwards' TAVR valves and capacity limits were a continued strain restricting growth. FAC ¶¶ 59–83. For example, one former employee, FE-1, stated that Edwards executives tracked data daily to project procedure volumes for the next 18 to 24 months and internally confirmed TAVR rates were tapering off. FAC ¶¶ 63–64, 81. Another former employee, FE-2, stated that Defendants understood the hospital capacity constraints affected TAVR growth. FAC ¶¶ 66–67. One other former employee, FE-5, noted that an issue with TAVR sales was raised to Zovighian as early as 2023. FAC ¶ 81. The former employees who made the allegations were in the following roles at Edwards: a Director of Sales Enablement & Development in the Structural Heart division, an engineer that worked on TAVR, a clinical specialist, Senior Director of Global Health Economics & Reimbursement, a Senior Product Manager within TMTT for a competing device, and a former Vice President of Edwards. FAC ¶¶ 59, 65, 69, 72, 80.

Moreover, internal TAVR volume reports showed significant losses, such as a 20% to 40% decrease in TAVR volumes in one former employee's region between Q4 2023 and Q1 2024. FAC ¶ 70. Defendants also learned from townhalls and in-person physician visits that hospitals were using their limited capacity for procedures that were more efficient and/or profitable for the hospital than TAVR. FAC ¶¶ 81–84. In addition, Defendants negotiated to acquire companies that produced non-TAVR heart products. FAC ¶¶ 58, 87–89. Zovighian did not sell any Edwards stock in the six-month period prior to the Class Period, but he did make a large sale of stock in May 2024. FAC ¶¶ 58, 86.

---

[3] The Former Edwards Employees are referred to as FE-1 through FE-5. *See* FAC ¶ 59 & n.3

On July 24, 2024, Defendants announced "lower-than expected growth in TAVR" and disclosed that Q2 2024 TAVR sales experienced only 6% growth year-over-year.  FAC ¶ 91.  Defendants also adjusted Edwards' full year 2024 revenue guidance for the TAVR platform from a projected 8% to 10% growth to a projected 5% to 7% growth.  *Id*.  Defendants explained the decline in TAVR growth was due to hospital workflow and capacity constraints.  FAC ¶¶ 92–94.  On July 25, 2024, Edwards' stock price dropped 31% from $86.95 per share to $59.70 per share, accounting for a loss of $16.4 billion in shareholder value.  FAC ¶ 99.

Louisiana Sheriff Fund and Fort Lauderdale P&F are public pension funds that purchased Edwards common stock during the Class Period and the putative class of similarly situated individuals to the named parties is all other persons or entities who purchased or otherwise acquired common stock from Edwards during the Class Period.  FAC ¶¶ 18–19.

### B.    Procedural Background

On October 14, 2024, Plaintiff Dhimant Patel filed suit against Defendants.  *See* Compl, Dkt. No. 1.  On March 21, 2025, Plaintiffs filed the FAC.  *See* FAC.  The FAC asserts three causes of action:  (1) that all Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (2) that Zovighian, Wood, Ullem, and Chopra violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and (3) that Zovighian violated Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.  *See* FAC ¶¶ 154–81.  Defendants filed their Motion on May 20, 2025.  *See* Mot.  On July 18, 2025, Plaintiffs opposed the Motion.  *See* Opp'n.  Defendants filed their Reply on August 18, 2025.  *See* Reply.

### C.    Request for Judicial Notice

Defendants filed a Request for Judicial Notice of seven exhibits, including on Form 10-K, two Form 8-Ks and one Form 4 which Edwards and Zovighian filed with the SEC, and three transcripts from Edwards' earnings calls during the Class Period.  *See* Request for Judicial Notice ("RJN"), Dkt. No. 55.  Plaintiffs opposed the RJN only as to Exhibit 2 (the transcript of Edwards' earnings call for the first quarter of fiscal year 2024 held on April 25, 2024) and Exhibit 4 (the transcript of Edwards' earnings call for the second quarter of fiscal year 2024 held on July 24, 2024).  *See* Opp'n to RJN, Dkt No. 61.  Plaintiffs do not dispute the

authenticity of these two documents but argue incorporation is not proper because
Defendants introduce the documents for the truth of the matter asserted therein.
*See id.*

A review of a motion to dismiss is generally "limited to the complaint,
materials incorporated into the complaint by reference, and matters of which the
court may take judicial notice." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540
F.3d 1049, 1061 (9th Cir. 2008) (citation omitted). A document is incorporated by
reference in a pleading if the complaint "refers extensively to the document or the
document forms the basis of the plaintiff's claim." *Khoja v. Orexigen
Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). "Unlike rule-established
judicial notice, incorporation-by-reference is a judicially created doctrine that
treats certain documents as though they are part of the complaint itself. The
doctrine prevents plaintiffs from selecting only portions of documents that support
their claims, while omitting portions of those very documents that weaken—or
doom—their claims." *Id*. Here, both documents are referenced in the FAC and
form the basis of Plaintiffs' claims. *See, e.g.*, FAC ¶¶ 52, 112–13, 115, 118, 128.
Defendants ask the Court to consider the whole transcripts, rather than just the
portions relied upon in the FAC, which they argue are misleading in the context of
the whole transcripts. Opp'n at 3–4. The Court agrees that the documents are not
being used to "merely create[] a defense to the well-pled allegations in the
complaint," *Khoja*, 899 F.3d at 1002, and the Court considers the documents to
assess the sufficiency of the claims.

Accordingly, the Court **GRANTS** Defendants' RJN.

## II.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed
because of a "failure to state a claim upon which relief can be granted[.]" Fed. R.
Civ. P. 12(b)(6). A dismissal under a 12(b)(6) motion can be based on either a
"lack of a cognizable legal theory" or on "the absence of sufficient facts alleged
under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534
F.3d 1116, 1121 (9th Cir. 2008) (internal quotation marks and citation omitted).
On a 12(b)(6) motion, courts accept as true all well-pled allegations of material
fact and construe them in a light most favorable to the non-moving party. *See*

---

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030□31 (9th Cir. 2008).

To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not" suffice. *Id.* (internal quotation marks and citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555. A court may consider the allegations contained in the pleadings, as well as exhibits attached to or referenced in the complaint, and matters properly subject to judicial notice in ruling on a motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

Leave to amend a dismissed complaint should be granted unless it is clear the complaint cannot be saved by any amendment. Fed. R. Civ P. 15(a); *see Manzarek*, 519 F.3d at 1031. A "district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). Otherwise, leave to amend shall be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).

## B.    Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

"Securities fraud complaints face heightened pleading requirements." *In re Nektar Therapeutics Secs. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022). "At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 [of the Exchange Act] must satisfy the dual pleading requirements" of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *Id.* (citation omitted).

Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To plead fraud with particularity, the pleader must state the false representations' time, place, and specific content, as well as the identities of the parties. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). The allegations "must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must

set forth what is false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks and emphasis omitted). In essence, the defendant must be able to adequately answer the fraud allegations. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). "By requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061.

## III.  DISCUSSION

Defendants argue the FAC fails to state a claim (1) against all Defendants under Section 10(b) of the Exchange Act and SEC Rule 10b-5 thereunder because Plaintiffs failed to plead material false statements or omissions, scienter, or loss causation; (2) against all Defendants under Section 20(a) of the Exchange Act because Plaintiffs failed to plead a primary violation of the Exchange Act; and (3) against Zovighian under Section 20A of the 1934 Exchange Act, 15 U.S.C. § 78t-1, because Plaintiffs fail to plead a predicate violation of the Exchange Act. *See* Mot.

Plaintiffs allege the following statements are materially false misstatements or omissions:[4]

**Statements in a Presentation from Edwards' 2023 Investor Conference**

1)    Edwards published on its website Defendants' presentation materials from Edwards' 2023 Investor Conference containing a slide titled

---

[4] Emphasis has been removed from the FAC. Defendants provide a chart of alleged misstatements. *See* Mot., Ex. A, Dkt. No. 54-1. Plaintiffs provide their own chart in opposition, which generally tracks Defendants' chart but is numbered differently. *See* Opp'n, Ex. A, Dkt. No. 60-1. The Court references Defendants' chart because it separates each statement.

2024 Sales Outlook of "8% - 10% Constant Currency Growth."  FAC ¶ 106.

2)  That same slide claims that "[i]mproving healthcare system capacity" was a "tailwind" for TAVR sales growth.  FAC ¶ 117.

3)  In that same presentation, "Defendants represented that their growth projection already took into account 'Competitive product launches' as a 'headwind.'"  FAC ¶ 106.

**Statements from a February 6, 2024 Form 8-K**

4)  On February 6, 2024, Defendants issued a press release within their Form 8-K wherein they "assured investors that they were 'confident in the sales guidance [they] provided at the December 2023 investor conference for all product groups.'"  FAC ¶ 108.

5)  In that same press release, Defendants stated that they were "confident in 2024 guidance of 8 to 10 percent constant currency growth."  *Id.*

6)  Also in that press release, Defendants stated that "the company remains confident that the future of TAVR remains strong driven by an increased focus on patient activation . . . as well as indication expansion and increased global adoption."  *Id.*

**Statement from a February 6, 2024 Earnings Call**

7)  On an earnings call from February 6, 2024, Defendant Ullem stated that Defendants were "maintaining all of [their] previous sales guidance ranges for 2024."  FAC ¶ 109.

**Statements from an April 25, 2024 Form 8-K**

8)  On April 25, 2024, Defendants issued another press release, which stated that Defendants "expect[ed] higher year-over-year second-half growth rates than in the first and second quarters" for TAVR.  FAC ¶ 111

9)  Defendants also stated that they "remain[ed] confident in TAVR sales growth of 8 to 10% on a constant currency basis."  *Id.*

10)  Defendants further stated that they were "confident in TAVR guidance."  *Id.*

11)  Defendants stated that "Edwards is positioned for healthy and sustainable TAVR growth well into the future driven by the company's development of differentiated TAVR technologies, a deep commitment to advancing patient care through high-quality clinical evidence, and its investment in patient activation initiatives."  *Id.*

**Statements from an April 25, 2024 Earnings Call**

12) In an April 25, 2024 earnings call, Defendant Zovighian stated: "[w]e remain confident in our full year TAVR sales growth of 8% to 10%. We expect a higher year-over-year second half growth rate than in the first and second quarters." FAC ¶ 112.

13) Defendant Zovighian further stated: "So we knew when we put together guidance for the year, the TAVR guidance, 8% to 10%, we knew that the [TAVR] growth ramp throughout the year and that Q1 will be our lowest growth quarter. So we feel we are confident about our 8% to 10% [TAVR growth]." *Id.*

14) Defendant Wood, in response to a question asking, "why [Defendants] expect TAVR growth to accelerate in the second half," stated: "We do expect TAVR procedures to ramp. That's always been a part of our plan, and so we continue to expect that to happen. . . . We were happy with the ramp in Q1. So I think we do expect to see an increase in Q2 over Q1. But even with that, we expect the second half to have a higher growth rate than the first half. So I think that that's good." *Id.*

15) "One analyst specifically asked Defendants to 'talk a little about the launch of EVOQUE and the activity that that drives in some of your major centers' and how Edwards 'manag[es] those activity levels or the bandwidth of those centers versus the continuing volumes that they perform in TAVR? Defendant Wood responded, '[t]his is kind of like what Daveen and I do every day,' we 'partner very closely on these sorts of things' and 'as we roll out these new therapies, we want to make sure that people do it with the right volume.'" FAC ¶ 119(a).

16) "Defendant Chopra supplemented that response, assuring investors, 'So for us overall, I don't necessarily believe that the EVOQUE procedures, for any time in the near future, are going to affect overall capacity.'" *Id.*

17) "Defendant Zovighian reiterated, 'What it is fair to say is that so far, we have not faced a big challenge in term of the centers having a lack of capacity to be able to treat patients, whether TAVR patients or EVOQUE patients.'" *Id.*

**Statement from a June 5, 2024 Analyst Call During the Jeffries Global Healthcare Conference**

18) "Defendant Ullem stated, 'TAVR, we started out in the first quarter with lower year-over-year growth rate than we expect for the full year.

Our guidance for TAVR for the year is 8% to 10%. We always knew that the first half of the year was going to be a lower year-over-year growth environment than the second half of the year. That's been our plan, and we saw that in the first quarter again." FAC ¶ 114.

## A.    Section 10(b) and Rule 10b-5 of the Exchange Act

Section 10(b) prohibits (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale, of any security," and (3) "in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). "Rule 10b-5 forbids, among other things, the making of any "untrue statement of a material fact" or omitting any material fact necessary to ensure previous statements made are not misleading. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (citing 17 C.F.R. § 240.10b-5). "To plead a claim under § 10(b) and Rule 10b-5, a plaintiff must allege (1) a material misrepresentation or omission [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Nektar*, 34 F.4th at 835 (quotation omitted).

Defendants' Motion argues Plaintiffs have not adequately pled (1) an actionable material misstatement or omission, (2) scienter, or (3) loss causation, and as such, the claims under Count I must be dismissed against all Defendants. *See* Mot.

## 1.    <u>Misrepresentation or Omission of a Material Fact</u>

First, Defendants argue that Statements 1 through 3 are not actionable because they were made before the Class Period. Mot. at 7–8. Second, Defendants argue that Statements 4 through 16 and 18 are forward-looking statements and thus not actionable statements. Mot. at 8. Third, Defendants argue that all Statements, including Statement 17, are genuinely held opinions. Mot. at 11. Fourth, Defendants argue that all Statements are non-actionable puffery. Mot. at 13. Fifth, Defendants argue that Plaintiffs do not allege falsity with particularity. Mot. at 13–17.

### i.    *Statements Made Before the Class Period*

As an initial matter, Statements 1 through 3 were made at an investor conference on December 7, 2023, before the Class Period. While the Ninth Circuit has not weighed in on whether statements made before the class period are

actionable, several district courts have held that pre-class statements are inactionable. *See DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1223 n.6 (S.D. Cal. 2001) ("Statements occurring before the class period are not actionable under Section 10(b) or Rule 10b–5" (citing *In re International Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)); *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *3–4 (N.D. Cal. Aug. 31, 2018). Plaintiffs do not dispute this and instead argue that Statements 1 through 3 are not pre-class period statements because they were published on Edwards' website throughout the Class Period. Opp'n at 11 n.5. Plaintiffs do not, however, allege reliance on statements published on the website that are stated to have been made at an earlier, specified time. Accordingly, the Court grants the Motion as to Statements 1 through 3.

### ii.    *Forward-Looking Statements*

Defendants argue that Plaintiffs' allegations, as to Statements 4 through 16 and 18, are not actionable because they are forward-looking and thus protected under the PSLRA's safe harbor provisions. Mot. at 8–9.

The PSLRA provides a "barrier at the pleading stage in the form of a safe harbor for 'forward-looking statements.'" *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (quoting 15 U.S.C. § 78u-5(i)(1)(A)). "[A] defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021) (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017)). The safe harbor provision, however, does not protect forward-looking statements if the plaintiff pleads "sufficient facts to show that the statement goes *beyond* the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion concerning a specific 'current or past fact.'" *Id.* (citation modified). The "PSLRA's safe harbor does not apply in an all-or-nothing fashion, because some statements about the future may combine non-actionable forward-looking statements with separable—and actionable—non-forward-looking statements." *Id.* "In the context of such 'mixed' statements, only the forward-looking aspects could be immunized from liability, because the safe harbor is not 'designed to protect [issuers] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement.'" *Id.* (alteration in original, citation omitted).

A forward-looking statement is defined as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

Plaintiffs argue that Defendants made two categories of misstatements to investors. *See* Opp'n at 8–11. The first category of purported misstatements is that Defendants expected TAVR sales to grow 8%–10% in 2024. Opp'n at 9. The second category of purported misstatements is that Defendants "misrepresented that hospital capacity constraints were not 'a big challenge' and the 'healthcare system capacity' was 'improving' and a 'tailwind' for TAVR sales growth in 2024." *Id.* (quoting FAC ¶¶ 116–20).

The Court finds that Statements 4 through 16, and 18 are forward-looking statements. Statements relating to expected TAVR sales growth are revenue

projections.[5]  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("[t]he alleged misstatements in analyst calls are classic growth and revenue projections, which are forward-looking on their face.").  These statements all "relate[] to future expectations and performance," are assumptions "underlying or related to" projections, or are otherwise regarding "expectations of the future impact of the external economic environment." *Id*. at 1059; *see, e.g., Waterford Township Police v. Mattel*, *Inc.*, 321 F. Supp. 3d 1133, 1150–51 ("reliance on present conditions of a company to make a projection is 'implicit in any forward-looking statement' protected by the PSLRA safe harbor provision") (citation omitted).  Accordingly, the Court concludes that Statements 4 through 16, and 18 are forward-looking.

Defendants do not argue that Statement 17 is forward-looking, so the Court does not address that Statement here.  This Statement relates to current challenges with hospital capacity restraints.

### a. Cautionary Language

The Court next considers whether the forward-looking statements contained adequate cautionary language.  "Adequate cautionary language under the PSLRA must identify 'important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Quality Sys.*, 865 F.3d at 1148 (citing 15 U.S.C. § 78u-5(c)(1)(A)(i)).  "To be adequate under the cautionary-language prong, the caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil.'" *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 877 (N.D. Cal. 2023) (quoting *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022)).  "Defendants bear

---

[5] Statement 7, that Defendants were "maintaining all of [their] previous sales guidance ranges for 2024," FAC ¶ 109, was made just after prefacing that Ullem would "provide a wrap-up of 2023, including detailed results of [Defendants'] fourth quarter, as well as provide guidance for the first quarter and full year 2024." Murphy Decl. ¶ 6, Ex. 3 at 6, Dkt. No. 54-6.  In context, this Statement is about future projections and is therefore a forward-looking statement.  Statements 13 and 18, although containing general language about current growth, do not contain any specific allegedly false or misleading current or past facts, but rather the statements are alleged to be false based on their future projections.  Statement 15 discusses future actions to "roll out these new therapies," which they will "want to make sure that people do it with the right volume."  Again, this is a future expectation.

the burden of showing 'their cautionary language was not boilerplate and conveyed substantive information.'" *Baker v. Twitter, Inc.*, 2023 WL 6932568, at *7 (C.D. Cal. Aug. 25, 2023) (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010)).

Defendants argue that Edwards' public disclosures were prefaced with warnings that they "'include[] forward-looking statements . . . based on estimates' and 'assumptions' that are 'inherently uncertain [and] difficult to predict' and may 'cause actual results to differ materially.'" Mot. at 9.  Plaintiffs respond that this language is boilerplate cautionary language, making it insufficient to warrant safe harbor protection.  Opp'n at 14.  In reply, Defendants argue that they provided cautionary language about competitive technologies and that the disclosures identified the risks that Plaintiffs alleged came to fruition.  Reply at 4.  Defendants point to language in the cautionary language regarding competitive risks of "established and newer technologies" for patients and that those competitive products could make their product uneconomical.  *See, e.g.,* Murphy Decl. ¶ 4, Ex. 1 at 4, Dkt. No. 54-4.

Here, the Court finds that Defendants have not established that the cautionary language was sufficiently meaningful at this motion to dismiss stage. The Ninth Circuit has held that "risk disclosures can be misleading to investors when they 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition.'" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir. 2008)).  "[C]autionary language is not 'meaningful' if it discusses as a mere *possibility* a risk that has already materialized."  *Id.*  Plaintiffs allege that by the time Defendants made their statements, the competitive risks, both external and internal, were already causing capacity constraints, which would eat into TAVR's market share and make it uneconomical.[6]  *See, e.g.*, FAC ¶¶ 64, 66, 78.

---

[6] Defendants rely on arguments that the basis of FE-3's knowledge was limited to a small region, but these arguments are more appropriately resolved at a later stage than on this motion to dismiss.  Reply at 3.  The same is true of Defendants' argument that they warned of hospital systems' continuing budget constraints, Reply at 4, which Plaintiffs allege were misleadingly couched in terms of possibilities and therefore did not provide sufficient caution regarding the projected rate of growth, *see* Opp'n at 14–16.

Accordingly, the Court does not find at this stage that the cautionary language provides for PSLRA's safe harbor for those Statements that the Court has found to be forward-looking.

### b. Actual Knowledge

The Court next addresses whether Plaintiffs have sufficiently pled that the Statements were "made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(i). Plaintiffs must plead actual knowledge with particularity "and the reasonable inference of plausibility set out in *Twombly* and *Iqbal*." *Weston*, 669 F. Supp. 3d at 880 (quoting *Glazer*, 63 F.4th at 766).

Here, the Court finds that Plaintiffs have adequately pled Zovighian's actual knowledge that the forward-looking statements were false or misleading. The FAC contains allegations that Zovighian and other "executives" knew the TAVR growth projections would not be met. For example, it is alleged that FE-1, who worked as the Director of Sales Enablement & Development in the Structural Heart division, was present for conversations that "made clear that data, market size, and market dynamics were being misrepresented" such that she "raised concerns about Edwards being unable to achieve expectations." FAC ¶ 60. This same employee reports that "Edwards executives knew there were problems with TAVR growth long before they cut revenue projections in July 2024 . . . as early as 2023." FAC ¶ 62. She claims that "executives" "had dashboards depicting the data" and talked about this data, including "exactly how many patients were in its pipeline, what was coming, and … the Company could project procedure volume over 18 to 24 months." FAC ¶ 63. Another former employee, FE-5, alleges that in the Spring of 2023, a company-wide townhall took place where the decline in TAVR rates was discussed, and that she also raised the issue of the decline in TAVR rates with an individual who she understood discussed it with Defendant Zovighian.[7] FAC ¶¶ 80–82.

---

[7] Although Defendants argue that FE-5 left the company prior to the class period, the information relied upon by Plaintiffs is that FE-5 raised the decline in TAVR rates to her supervisor, who then raised the issue with Zovighian, prior to the class period during which the allegedly false or misleading statements were made, which Plaintiffs assert demonstrates that Zovighian had prior knowledge that was not disclosed and that therefore made the statements false or misleading. *See Quality Sys.*, 865 F.3d at 1145 ("Although CW6 was not at QSI during the Class Period, as

Accordingly, the FAC sufficiently pleads that the Statements were made with actual knowledge of falsity as to Zovighian.[8]  However, as to the other named individual Defendants, the FAC only generally refers to "executives," without specifically alleging facts from which the actual knowledge of Wood, Ullem, and Chopra can be inferred.  Accordingly, and as discussed below with regard to scienter, the motion is **GRANTED** as to Wood, Ullem, and Chopra.

### iii.    Genuinely Held Opinions

Defendants argue that all the Statements, including Statement 17, are the genuinely held opinions of the speakers and thus not actionable.  Mot. at 11. Defendants contend that the Statements contain phrases like "we feel," "expect," "believe," or are "confident" in, which indicate they are opinions.  *Id.*

The Supreme Court "establishe[d] three different standards for pleading falsity of opinion statements."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183–85 (2015)).  "First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue."  *Id.*  (quoting *Omnicare*, 575 U.S. at 186). "Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that 'the supporting fact [the speaker] supplied [is] untrue.'"  *Id.* (quoting *Omnicare*, 575 U.S. at 186) (alterations in original).  "Third, when a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue

---

COO CW6 had personal knowledge of executive-level management's real-time access to Salesforce reports forecasting quarterly sales").

[8] Although Defendants argue that the FAC does not allege the witnesses are described with sufficient particularity to establish their reliability and personal knowledge, the Court disagrees. The "complaint must provide an adequate basis for determining that the witnesses in question have personal knowledge of the events they report." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  At least as to FE-1 and FE-5, the FAC provides sufficient facts that the witnesses were in a position to have personal knowledge of the information alleged.

misleading to a reasonable person reading the statement fairly and in context.'" *Id.* (quoting *Omnicare*, 575 U.S. at 194).

Defendants limit their argument to the first standard. *See* Mot. at 11. In response, Plaintiffs argue that the third standard for pleading falsity of an opinion statement is met. Opp'n at 18. Specifically, Plaintiffs argue that "Defendants' statements misleadingly omitted facts they knew regarding stalled TAVR growth and the negative impact of hospital capacity constraints." *Id.*

The Court has already described how the FAC alleges sufficient facts regarding the alleged omissions of capacity constraints and competition, both external and internal, as well as declining sales. Defendants' statements about the growth of TAVR are alleged to have "affirmatively create[d] an impression of a state of affairs" that "did not fairly align[] with the information in [Edwards'] possession at the time." *Glazer*, 63 F.4th at 771 (citations omitted) (first alteration in original). Accordingly, the Court finds that Plaintiffs have sufficiently pled falsity of opinions by omission.

  iv.   *Falsity*

Defendants argue that Plaintiffs do not allege falsity with particularity because TAVR sales still grew during the Class Period. *See, e.g.*, Mot. at 15. Plaintiffs contend, on the other hand, that Defendants misrepresented the projected rate of growth by omitting information regarding TAVR declining sales, hospital capacity constraints, and competing products. *See, e.g.*, Opp'n at 10.

By apparently relying on a theory of omissions, Plaintiffs therefore seem to abandon a theory that the 8%–10% guidance was false.[9] "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008. "Indeed, '[t]o be misleading, a statement must be capable of objective verification.'" *Id.* (alteration in original, citation omitted). "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09. "Disclosure is required only when necessary to make statements made, in the light of the circumstances under which

---

[9] If Plaintiffs do rely on theory of actual falsity, they do not explain how the information Defendants possessed at the time could support actual sales growth of 6% but not in the range of 8%–10%, particularly given the general level of detail alleged regarding declining sales and hospital capacity constraints.

they were made, not misleading." *Id*. at 1009 (citation modified). "As such, companies can control what they have to disclose under these provisions by controlling what they say to the market. But once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Id*. (alterations in original) (quotation marks and citation omitted.)

Defendants do not address Plaintiffs' theory of omissions. Moreover, Defendants' arguments—that Defendants told investors they expected that the rate of growth would slow (from 12% to 8%–10%, but not down to 6%), whether the information Defendants possessed at the time regarding TAVR sales and hospital capacity constraints supported a lower rate of growth than projected sufficient to establish a material omission, and that Edwards recorded a full-year TAVR sales within its initial guidance—are better resolved at a later stage as the Court assumes the truth of the allegations currently pled. *See* Reply at 1–2, 6

  *v.* *Puffery or Corporate Optimism*

Defendants argue that at least 12 of the Statements (Statements 4 through 14, and 18) are statements of corporate optimism or puffery and thus not actionable. Mot. at 13. "Statements of mere corporate puffery, vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Police Ret. Sys.*, 759 F.3d at 1060 (9th Cir. 2014) (quotation omitted). "But even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *Quality Sys.*, 865 F.3d at 1143.

"[D]etermining whether a given statement is material 'entail[s] delicate, fact-intensive assessments that are more properly left to the jury.'" *In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *11 (N.D. Cal. June 13, 2025) (quoting *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244 (S.D.N.Y. 2012)), *amended on denial of reconsideration*, 2025 WL 2265575 (N.D. Cal. July 29, 2025). "Thus, in deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution." *Id.* (citation modified). Dismissal on these grounds is proper "only if [the Statements] are so obviously unimportant to a reasonable investor that reasonable minds could

not differ on the question of their unimportance." *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (quotation omitted).

Plaintiffs argue that puffery determinations are better suited to a jury determination, not a dismissal on the pleadings. Opp'n at 17. In addition, Plaintiffs argue that Defendants' statements were "bullish" when in reality, they knew TAVR sales were "sluggish" and not looking great before and during the Class Period. *Id.*

Here, in light of the specific projections and information alleged to have been conveyed by Defendants, the Court does not find dismissal to be appropriate at this stage.

### 2.   <u>Scienter</u>

In a securities fraud claim, a plaintiff must plead "with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). Scienter "is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys.*, 865 F.3d at 1144 (citation and quotations omitted). "In the securities context," a defendant is deliberately reckless if he "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (citation modified).

"In determining whether the pleaded facts give rise to a strong inference of scienter" courts apply a holistic approach and "must take into account plausible opposing inferences." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (internal quotation marks omitted) (citing *Tellabs*, 551 U.S. at 323). "The danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569–70 (9th Cir. 1990) (en banc) (citation modified).

Here, the parties discuss the following with respect to scienter, which the Court weighs in its holistic consideration of whether there is a strong inference of scienter: (1) Defendant Zovighian's stock sale in May 2024; (2) Defendants' compensation packages; (3) internal Edwards reports showing a decrease in TAVR sales growth; (4) internal Edwards statements regarding hospital capacity

constraints; and (5) the value of TAVR to Edwards prior to 2024.  *See* Mot. at 17–
23; Opp'n at 18–23.

As to the stock sale, Zovighian sold $755,000 worth of common stock on
May 30, 2024, FAC ¶¶ 14, 86, 129, and Plaintiffs point to this financial gain as a
motive for Defendants to make misstatements and ensure they can sell their stock
at a higher amount, *see* Opp'n at 22–23.  *Cf. Prodanova v. H.C. Wainwright & Co.*,
*LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021) ("lack of a plausible motive certainly
makes it much less likely that a plaintiff can show a strong inference of scienter").
However, sales of company stock only support a showing of scienter when they are
"dramatically out of line with prior trading practices at times calculated to
maximize the personal benefit from undisclosed inside information."  *No. 84
Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320
F.3d 920, 938 (9th Cir. 2003).  Although Zovighian sold double the shares he did
the year prior, he sold only approximately 12% of his entire stock holdings and
continued his established pattern of offloading in May.  *See* Murphy Decl. ¶ 10,
Ex. 7, Dkt. No. 54-10.  Standing alone, these facts do not show the sale to be so
dramatically out of line with prior trading practices to establish scienter.  *See
Metzler*, 540 F.3d at 1067 (finding the sale of 37% of defendant's stock holdings
did not show scienter while also comparing that sale to those by other defendants).
There are no allegations that other Defendants sold stock during this time.

Additionally, though Defendants have stock-based compensation packages,
such compensation plans are common practice, and this does not significantly
weigh in the balance.  *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884
(9th Cir. 2012) ("[The court] will not conclude that there is fraudulent intent
merely because a defendant's compensation was based in part on such successes").

But, as discussed above, Plaintiffs have sufficiently pled actual knowledge
of falsity as to Zovighian.  The Court concludes that these allegations also
sufficiently support a strong inference of at least deliberate recklessness.[10]  In
*Quality Systems*, where it was alleged that defendants made "false or misleading
statements about the current and past state of [its] sales 'pipeline,' and used those
statements to support public guidance to investors about [its] projected growth and
revenue" because individual defendants "had real-time sales information showing a

---

[10] The issue is a very close one.  The Court would therefore consider phased
discovery limited to the issue of Zovighian's knowledge and scienter, as well as
early motion practice, or other potential relief requested by Defendants.

decline in sales due to market saturation," 865 F.3d at 1135, the Ninth Circuit found sufficient allegations of scienter where statements by confidential witnesses established that defendants "had access to and used reports documenting in real time the decline in sales during the Class Period", *id*. at 1145. Similarly, here, the FAC alleges that the former employees had personal knowledge of declining sales as well as data that could be used to project procedure volume over a significant period of time, and that Zovighian was specifically informed of the decline. "These particularized allegations that defendants had actual access to the disputed information, raise a strong inference of scienter." 865 F.3d at 1145 (citation modified). The inference of scienter here is "as compelling as any opposing inference one could draw from the facts alleged," *Tellabs*, 551 U.S. at 324, including that Defendants made forward-looking assessments based on data available to them and, when conditions changed, adjusted expectations going forward, Reply at 11.[11]

However, because the FAC does not specify facts as to Wood, Ullem, and Chopra, the Court **GRANTS** the Motion as to these Defendants. *See, e.g., In re Intel Corp. Sec. Litig*., 2023 WL 2767779, at *25 (N.D. Cal. Mar. 31, 2023) ("Taken together, Lead Plaintiffs' allegations paint a picture that there were problems with Intel's 7nm development, and perhaps, given the importance of 7nm to Intel, that the Individual Defendants were generally aware that issues existed.

---

[11] Defendants rely heavily on *Wochos v. Tesla, Inc*., 985 F.3d 1180 (2021). There, Tesla described its productions goals for its Model 3, but plaintiffs alleged during the class period that Tesla knew it would not be able to achieve its production goals and repeatedly reaffirmed that it was on track to reach those targets even as the delays grew increasingly significant. *Id*. at 1185–86. The Ninth Circuit found that "the district court correctly held that Plaintiffs failed to plead any facts showing that Musk ever accepted those employees' views that the goal was impossible. In particular, the district court properly held that Plaintiffs had failed to plead facts showing that Defendants adopted the conservative timeline for production on which these employees' pessimism was based." *Id*. at 1194. Defendants argue here that Plaintiffs similarly fail to plead facts to show that Zovighian or other individual defendants accepted the data. Mot. at 20–21. However, *Wochos* dealt with allegations regarding the company's internal ability to meet aggressive targets. 985 F.3d at 1184–85. This case (and *Quality Systems*) deal with Defendants' knowledge of data regarding sales that are impacted by external market pressures. Whether or not Defendants "accept" the data largely does not change the nature of the disclosure.

The allegations go no further, though.  Because the complaint is lacking allegations describing with particularity the information that Individual Defendants received, or the documents that they had access to, the Court cannot infer that any Individual Defendant knew Intel could not meet its 7nm goals or were deliberately reckless in not realizing.").

### 3.    Loss Causation

Defendants argue Plaintiffs did not plead loss causation with particularity because they did not plead loss caused by the *revelation* of fraud.  *See* Mot. at 23–24.  "Broadly speaking, loss causation refers to the causal relationship between a material misrepresentation and the economic loss suffered by an investor."  *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014), *as amended* (Sept. 11, 2014).  At the pleading stage, a "plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors."  *Metzler*, 540 F.3d at 1062.  Even where a plaintiff cannot prove the *revelation* of fraud caused loss, a plaintiff may also prove loss causation by tracing the loss back to "the very facts about which the defendant lied."  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).

Here, Plaintiffs alleged Defendants made material omissions to cover up the decline in TAVR sales growth and the toll hospital capacity constraints was taking on TAVR sales.  *See* FAC ¶¶ 106, 108–09, 111–112, 114, 117, 119.  Plaintiffs allege these two factors caused loss to the value of the stock because the alleged omissions regarding TAVR were the basis for the alleged inflated value of the stock.  FAC ¶¶ 133–140.  Accordingly, Plaintiffs adequately plead loss causation.

Therefore, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion as to Count I.

### B.    15 U.S.C. § 78t(a) [12] and 15 U.S.C. § 78t-1(a)

Defendants argue that Plaintiffs have failed to state a Section 20A, 15 U.S.C. § 78t-1(a), claim as asserted against Defendant Zovighian because Plaintiffs (i) fail

---

[12] Defendants argue that Plaintiffs' Section 20(a) claim under Count II fails because the predicate Section 10(b) claim fails.  *See* Mot. at 24 n.6.  Because the Court has

to state a predicate Section 10(b) claim, (ii) fail to plead facts showing Zovighian possessed material nonpublic information and how he learned it, and (iii) fail to plead that Plaintiffs traded contemporaneously with Zovighian.  Mot. at 24.

To state a claim under Section 20A of the Exchange Act for insider trading, "a plaintiff must allege that (1) the defendant committed an Exchange Act violation by 'purchasing or selling a security while in possession of material, nonpublic information'; and (2) the defendant's trade occurred 'contemporaneously' with a complementary trade made by the plaintiff." *In re Arrowhead Rsch. Corp. Sec. Litig.*, 2016 WL 6562066, at *11 (C.D. Cal. Mar. 29, 2016) (quoting 15 U.S.C. § 78t-1(a)).  "[T]he Ninth Circuit has explained that [this] rule 'ensures that only private parties who have traded with someone who had an unfair advantage will be able to maintain insider trading claims.'" *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1135 (N.D. Cal. 2020) (quoting *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993))

To the extent Defendants argue that Plaintiff's Section 20A claim fails because Plaintiffs have failed to state a predicate claim under Section 10(b), that argument fails because the Court finds that Plaintiffs have sufficiently stated a Section 10(b) claim.

The Court also finds that Plaintiffs have sufficiently pled facts regarding the material nonpublic information that Zovighian possessed—namely, the knowledge of TAVR's capacity constraints and slowed growth and how that information did not align with Defendants' public growth projections for TAVR.  *See, e.g.*, FAC ¶¶ 66 (Zovighian discussing TAVR patient enrollment at Town Halls), 86, 176.

"The Ninth Circuit has not delineated the boundaries of contemporaneity, and courts in this circuit have adopted thresholds ranging from same-day trading to several day gaps." *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *18 (N.D. Cal. Mar. 31, 2023).  District courts in this circuit have found that trades that took place later than those here were contemporaneous.  *See id.* at *19 (finding a four-

---

found that Plaintiffs sufficiently stated a claim under Section 10(b), except as to Ullem, Wood and Chopra, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion as to Count II, consistent with the Court's finding as to Count I.  *See, e.g., HP, Inc.*, 738 F. Supp. 3d at 1217 (denying the motion to dismiss the Section 20(a) claim when defendants only moved to dismiss on a failure to state the predicate claim because the predicate claim survived).

day gap contemporaneous and collecting cases where trades were found contemporaneous that took place five, six, seven, and eight days apart).  Plaintiffs allege that Zovighian made his purported insider sale of common stock on May 30, 2024.  FAC ¶ 176.  Plaintiffs further allege that Fort Lauderdale P&F purchased common stock on June 3, 2024. [13]  As the trades here were just two trading days apart (four days total), the Court finds that these trades, as alleged, are sufficiently contemporaneous.

But fatal to Plaintiffs' claim here is that the sufficiently contemporaneous trades are for different prices.  Zovighian sold his shares for $87.68 per share while Fort Lauderdale P&F purchased its shares for $87.47 per share.  "[C]ourts have consistently held that shares purchased below the defendant's sale price cannot satisfy the contemporaneity requirement, because it is impossible that those trades occurred with defendant at an unfair advantage."  *Align Tech.*, 485 F. Supp. 3d at 1136; *MicroStrategy*, 115 F. Supp. 2d at 663 ("The fact that plaintiff bought shares at a lower price than that at which defendant sold suggests that 'plaintiff could not have traded with defendant'").

Accordingly, the Court finds that Plaintiffs have not sufficiently pled a claim against Zovighian under Section 20A.  Therefore, the Court **GRANTS** Defendants' Motion as to Count III of the FAC.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES in part and GRANTS in part** Defendants' Motion, with leave to amend.  Any amended complaint must be filed and served within 14 days.

**IT IS SO ORDERED.**

---

[13] The Court here only refers to the trade alleged to have occurred after Zovighian sold his shares.  *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 664 n.91 (E.D. Va. 2000) ("No liability can attach for trades made by plaintiffs before the insider engages in trading activity").