UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

DHIMANT PATEL,                    )Case No. SA CV 24-02221-AH-
                                  )                        KES
          Plaintiff,              )
                                  )Los Angeles, California
vs.                               )
                                  )Wednesday, September 17, 2025
EDWARDS LIFESCIENCES              )
CORPORATION, et al.,              )(2:03 p.m. to 2:24 p.m.)
                                  )
          Defendants.             )
_____)


TRANSCRIPT OF DEFENDANT'S MOTION TO DISMISS
BEFORE THE HONORABLE ANNE HWANG
UNITED STATES DISTRICT JUDGE


Appearances:              See next page.

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Yolanda Skipper

Transcribed by:           Jordan Keilty
                          Echo Reporting, Inc.
                          9711 Cactus Street, Suite B
                          Lakeside, California 92040
                          (858) 453-7590

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

*Echo Reporting, Inc.*

2

APPEARANCES:

For the Plaintiff:                  JEREMY P. ROBINSON, ESQ.
                                    SALVATORE J. GRAZIANO, ESQ.
                                    Bernstein Litowitz Berger &
                                      Grossmann, LLP
                                    1251 Avenue of the Americas
                                    New York, New York 10020
                                    (212) 554-1492

For Defendants:                     KRISTIN N. MURPHY, ESQ.
                                    JORDAN D. COOK, ESQ.
                                    Latham & Watkins, LLP
                                    650 Town Center Drive
                                    20th Floor
                                    Costa Mesa, California 92626
                                    (714) 755-8290

3

Los Angeles, California; Wednesday September 17 2025 2:03 pm

--o0o--

(Call to Order)

THE CLERK:  Calling Item Number 4, SA Civil Case 24-2221, Dhimant Patel versus Edwards Lifesciences Corporation.

Counsel, state your appearance at the lectern.

MR. ROBINSON:  Good afternoon, your Honor.  Jeremy Robinson from the Law Firm of Bernstein Litowitz Berger and Grossmann, on behalf of lead Plaintiffs.

MR. GRAZIANO:  Also from Bernstein Litowitz, Salvatore Graziano.  Good afternoon, your Honor.

MS. MURPHY:  Your Honor, Kristin Murphy of Latham and Watkins on behalf of Defendants.

MS. COOK:  Good afternoon, your Honor.  Jordan Cook, also on behalf of the Defendants.

THE COURT:  All right.  Good afternoon to all of you.

I  have circulated a tentative order.  It is the Defendants' motion.  Do you wish to be heard?

MS. MURPHY:  Yes, your Honor.  Thank you.

Your Honor, I had a small slide deck.  I printed it out.  Would you mind if I hand it up to you and your clerk?

THE COURT:  Okay.

4

MS. MURPHY:  Thank you.

(Pause.)

THE COURT:  And you've, of course, given a copy to Plaintiff's counsel?

MS. MURPHY:  Yes, your Honor.

THE COURT:  Okay.

MS. MURPHY:  And I'm not going to walk through it because obviously I appreciate the time your Honor spent on the tentative.  So, I am going to address, you know, the points that you raised in the tentative, but I may refer to it.

So, a couple of points I want to address, starting with cautionary language.  So, obviously, I -- I appreciate your Honor's findings on forward looking statements.  To start with, I do think that the -- the language that we included in our filings was beyond boilerplate.  I think we warned investors of the exact type of risks that materialized here.  We -- and if you look at the -- you know, we warned investors that the hospital systems continued to experience budget constraints and staffing shortages.  We warned investors that results may differ as new product approval -- new products were approved and adopted.  We also warned investors that medical procedure rates and demand for products would continue to fluctuate.

We -- you know, I think these are the exact types of

5

things that affected the growth as -- as Plaintiffs claim. So, I think, you know, beyond just sort of identifying the statements as forward looking, we did warn that the exact types of product growth, product competition, et cetera could impact the growth of these products.

You know, obviously we think cautionary language immunizes these statements, but I think more to the point, I want to talk about the actual knowledge aspect of this because we don't think at all that the former employees get to anyone's actual knowledge of the falsity of these statements.

These former employees -- and I -- I think your Honor, you know, a couple of times said that you can't, you know, resolve certain things in our favor on the pleadings, and I certainly understand that, but I think the Plaintiffs carry a very heavy burden under the PSLRA, and I think that's especially true when you're talking about showing actual knowledge for forward looking statements.  And not one of these -- not one of these former employees, you know, setting aside what their particular roles are, setting aside that, you know, they're localized geographically or lower level employees, not one of them is alleged to have directly interacted with the Chairman Bernard Zovighian, the CEO, Bernard Zovighian, not one of them.  Not one of them is alleged to have been responsible for TAVR forecasting or

even to report to someone who was responsible for TAVR forecasting.  So, I think that's really critical that these -- these people just saying that they saw bad data or that -- that Mr. Zovighian had access to bad data, what data? What was it saying?  What did it tell Mr. Bernard about specifically -- or Mr. Zovighian specifically that eight percent growth wasn't achievable?  Because a really critical component of this timeline is that Edwards delivered eight percent growth in Q1, right.

So, this -- this whole class period is February of 2024.  They go out, and they tell the market that they're going to grow TAVR sales.  They -- they hope to grow TAVR sales eight to ten percent.  And then Q1 -- they have Q1 and then Q2, and Q2 is when they start to slow down.  And, so, at the end of Q2, they adjust expectation.  This all happens under a very short amount of time, and Q1 still goes well. Q1 is still -- they're still growing the business. Everything is still going fine.

And, so, as soon as things start to slow down in Q2, they adjust expectations at the very next opportunity. And, so, you know, these -- these -- at these, we're saying that, you know, bad data's coming in.  There's just no actual specific contemporaneous information that Mr. Zovighian is alleged to have had that made eight percent unachievable at any particular point in the -- in the class

period.

THE COURT: Well, I think the disconnect between you two is -- I might agree with you if the theory that is alleged is one of actual falsity as to the eight to ten percent. The disconnect between what you two are arguing is -- and the Plaintiffs can correct me if I'm misunderstanding their opposition, but they really seem to be arguing more of an omission theory, that in -- at the time that they were -- that the Defendants were expressing confidence in this range of growth, that they had specific knowledge of current conditions that made that confidence misleading. And you are arguing a theory that they -- that it's false, that eight to ten percent was achievable. Those are not the same theories.

So, I understand your point with regard to a theory of actual falsity, but they don't seem to really be relying on that type of theory. But, again, they can correct me if my understanding is wrong. It was not entirely clear to me from the pleadings what the --

MS. MURPHY: Well, your Honor --

THE COURT: -- theory was, but that's what I can glean.

MS. MURPHY: I think that's kind of the point, though. I think that relies on the same -- the exact same thing that they need to show, right, that they have to show

8

that there was material undisclosed information, and that's what they haven't done.  There is no contemporaneous material undisclosed information that any one of these former employees has identified whether Mr. Zovighian had it or not, whether it existed.  It didn't exist.  This -- we're talking about, you know, was it growing at this rate or a tiny bit slower or a tiny bit faster.  This all happened over a matter of, you know, this -- this very short time period.

This -- this company expected big growth, and then it -- it still grew.  It just grew slightly slower.  This is not fraud.  This is a company adjusting expectations as soon as it became clear it was not going to meet those expectations.

THE COURT:  It may well --

MS. MURPHY:  And Mr. --

THE COURT:  -- end up being as you're describing it, but that is not what is being pled.  And, so, that -- that's the trouble that I'm having.  At this --

MS. MURPHY:  Well --

THE COURT:  -- stage, in fairness, what is being pled is that they had data that sales were declining at that time, and they had data about current hospital constraints, and I'm taking those facts as alleged to be true.  And, based on that, it's alleged that it was materially

misleading that they were expressing this confidence in a larger growth because they didn't disclose the conditions.

So, that's -- that's the theory.  It may well be that it ends up in the way that you are describing it, but I think that's more for fact development.

MS. MURPHY:  I think the cases are very clear that the former employees have to identify a who, a what, a where, to whom was the information given, what exactly was the information.

Your Honor quoted I think Vaxart, which is a very very different case, a very -- you know, the -- the -- the situation there was that a -- you know, a -- Vaxart I think claims to be developing a COVID vaccine, had claimed to be in a partnership with a -- a developer that didn't actually have a certification for a vaccine.  So, they said they were going to develop, you know, a billion vaccine doses, and they had the capability of zero.  That is so far from the facts here, your Honor.

I want to direct your attention to the Lopez v. Tesla case which had former employees who identified specifically, they said they were in a meeting with Elon Musk who -- who was told specifically that you cannot meet this production timeline of 5,000 vehicles by X date.  You cannot meet this.  However, the Court found there was no actual evidence that Elon himself had adopted the view of

10

those employees that he couldn't meet those timelines, right.  These employees might think that that data wasn't great, but that doesn't mean that Mr. Zovighian accessed this data and thought, Wow, yeah, that -- that means we're not going to hit these numbers.  They really have not connected the dots in the way that the case law requires them to do.

FE-5 I also -- I feel that -- compelled to point out because your Honor did rely on FE-5 a bit.  FE-5 left the company before the class period, and they specifically -- I -- I want to point this out because they specifically allege that this new product of Edwards, EVOQUE, was already cannibalizing TAVR sales in 2023.  EVOQUE was not even approved by the FDA until 2024.  And, so, I -- you know, I understand that you have to give these former employees some credibility at the pleading stage, but when their allegations are just completely inconsistent with reality, that -- that does undermine this case a little bit.

With respect -- again, with respect to Mr. Zovighian, you know, none of these former employees have any direct ties to him whatsoever, and his lack of motive, again, really supports that there should be no case against him.  Your Honor yourself, you -- you went, you know, consistent with the case law.  His stock sale is not nefarious.  It's not suspicious.  It's consistent with prior

11

trading.  You know, it's in line with another trade he made, just, you know, as he does every May.  There is -- he has not profited at all.  This was a very -- this was a blip.  This was, you know, the stock price dropped.  It happened.  They missed -- they missed guidance, as happens.  It was not securities fraud.

Do you have any other questions for me?

THE COURT:  No.

MS. MURPHY:  Okay.  Thank you.

THE COURT:  Thank you.

MR. ROBINSON:  Thank you, your Honor.  Jeremy Robinson from the Law Firm of Bernstein Litowitz Berger and Grossman, on behalf of lead Plaintiffs.

Your Honor, we agree entirely with the Court's analysis.  The theory of omissions is a key part of this case, as your Honor correctly pointed out.  We agree with the analysis in your tentative and thank you for the thorough job and correct analysis that you conducted there.

My understanding -- I just wanted to confirm my understanding is that the statements 4 through 18 have all been sustained and are in the case.  There was just one ambiguity about statement 17 which actually isn't even forward looking, but we understand that that's in the case, and I just wanted to confirm my understanding on the record.

Your Honor, subject to any questions, I just had a

12

few quick points of clarification.  I note in -- on page eight in footnote four of the tentative opinion, it notes -- the text states:

"Plaintiffs do not respond to Defendants' chart of misstatements."

We did file a response, your Honor.  It was filed at ECF Number 60-1, and I just wanted to point that out to -- to clarify.

THE COURT:  Meaning you have your own chart of the statements at issue?

MR. ROBINSON:  We do, your Honor.  I actually have a copy if -- if I may approach and hand it up, but it's on the -- it's on the docket.

(Pause.)

THE COURT:  I see.

MR. ROBINSON:  It doesn't change anything, your Honor.  It's just a -- a mere point of clerical clarification.

THE COURT:  Are there other statements other than what I have addressed as 1 through 18?

MR. ROBINSON:  No, your Honor.  You have thoroughly addressed all of the statements.

THE COURT:  Okay.  So --

MR. ROBINSON:  It's really just a housekeeping matter.

13

THE COURT: So, you've narrowed the number of statements then. Is that -- the numberings are confusing to me because you have 1 through 4, then 1 through --

MR. ROBINSON: We split them into --

THE COURT: -- 8.

MR. ROBINSON: -- capacity-related statements and growth-related statements but it's the same statements. I believe Defendants split out a couple of statements, and that's the major discrepancy between the numbering. But we --

THE COURT: Okay.

MR. ROBINSON: -- agree with the numbering that your Court -- that the Court used in its tentative.

THE COURT: Okay. I appreciate the clarification.

MR. ROBINSON: Thank you. Your Honor, on page 8 of 24 of the tentative, there's a note about the slides that were published pre-class period, and we appreciate the Court's analysis.

Your Honor, these slides were available to the public throughout the entire class period. That means on each day of the class period, there was a statement characterizing improving healthcare system capacity as a tailwind when internally in meetings, are recounted by Former Employee Number 4, Defendants were characterizing those same capacity issues as headwinds.

14

So, I just wanted to point out that that was incorporated into the stock price.  And, so, under the theory of reliance on -- that's articulated in this case, reliance on the integrity of the market, that is impounded into the stock price.  And so --

THE COURT:  Well, the issue that I'm having with this is that this -- the -- the slide presentation has a particular date that it was created that -- so, just because it's on the website doesn't mean that now every day that it's available on the website that it's a statement that's made over and over again necessarily if it's clear that the presentation was made on a certain time -- point in time.

So, if -- it's not the same thing I think as saying just because it's on the website it's being made over and over again, so, therefore it's part of the class period. I think you do have to go a step further and make an allegation that even though it was clearly made at some earlier point in time, that there was some reliance on this based on whatever the facts are about it being on the website.  But I -- I don't think you've done enough to allege those particular statements, but I'm giving you an opportunity to amend.  So, you're just going to need to clarify.  But -- but I don't think that it's enough to just say that it was available.  So, therefore it's made over and over again during the class period.

15

MR. ROBINSON:  I appreciate your comments, your Honor.  Thank you very much.  I will only say in response that it's the same guidance that Defendants kept on referring to throughout.  So, they would direct investors when they reaffirmed and doubled down on that outlook guidance, and they would be referring to this exact presentation, which refreshes it in our -- in our -- from our position.

THE COURT:  And then -- but then the statement is something different.  It's the statement made in the present time.  To the extent it refers to earlier statements made, then you're looking at that particular statement to see if it's forward looking and to see what the cautionary language is and to see what the actual knowledge is.  You're not just going back in time to some other statement and reviving that.  It has to be incorporated.

MR. ROBINSON:  Yes.  I appreciate that, your Honor.  They did incorporate it throughout the class period by constantly referring to it and reaffirming the same guidance.  And I'll note that the statement that I'm -- I'm specifically talking about is not a forward looking statement at all.  It is a statement of present fact.  It is the statement that improved -- that healthcare system capacity was improving -- that's not forward looking. That's a statement of fact, present fact -- and that it was

16

a tailwind.  FE-4 reported that in meetings, the Edwards executives were referring to the same capacity issues as headwinds, the opposite of what they were telling investors.

But I appreciate your Honor's --

THE COURT:  Okay.  But then -- but -- so, I'm going to go back and look at your chart.  But, again, then it needs to be the statement that is made at that present time.  To the extent it incorporates it, you're still looking at that present statement.

MR. ROBINSON:  It's a statement of present fact made at -- on every day throughout the class period is our position.

THE COURT:  Right.  I just disagree with you.

MR. ROBINSON:  I appreciate that, your Honor, and --

THE COURT:  Okay.

MR. ROBINSON:  -- I thank you for -- for listening to me and hearing my submissions.

THE COURT:  Okay.

MR. ROBINSON:  So, subject to those points, we agree with your analysis on actual knowledge, and we believe that this case should move forward expeditiously into discovery, and we, at this point, don't anticipate an amendment, and we want to move quickly into discovery.

THE COURT:  Okay.  But, to be clear, though, the

17

motion would be granted as to the other remaining individual Defendants.

MR. ROBINSON:  I appreciate that.  We would have Zovighian, the CEO, in the case and the statements 4 through 18.

THE COURT:  Okay.  So -- so, you don't intend to amend?  It would just be Defendants Edwards and Zovighian, 4 through 18 as described by Defendants, not incorporating anything that you've put in your chart?

MR. ROBINSON:  As described by the -- by the Court in its tentative, but, yes, otherwise, yes.

THE COURT:  I just want to be clear that I adopted essentially the Defendants' chart.

MR. ROBINSON:  Yes.

THE COURT:  So, I just -- I want to make sure we're all on the same page as to what the statements are.

MR. ROBINSON:  Thank you, your Honor.

THE COURT:  So -- so, it's Defendant, you're -- you don't plan to amend.  It's Defendants Edwards Corporation, Zovighian only, and statements 4 through 18?

MR. ROBINSON:  Correct, your Honor.  Thank you very much.

THE COURT:  Okay.

MR. ROBINSON:  And subject to any questions, I would submit.

18

THE COURT:  I don't have questions.

Do you wish to respond?

(Pause.)

MS. MURPHY:  Your Honor, obviously we agree that those three statements should not be kept in.  It sounds like your Honor has already made up your mind.  Are you --

THE COURT:  I don't plan to change my tentative ruling on that issue.

MS. MURPHY:  Okay.

THE COURT:  Or as to the other Defendants either.

MS. MURPHY:  Okay.

THE COURT:  So, if there's something you want to respond to, go ahead.  Now is your opportunity.  I'll take the matter under submission.

MS. MURPHY:  Yeah.  I would just ask you again to look at the -- the Tesla case on the Zovighian point and the Vaxart case again and -- and just really to look at the -- the burden on the former employees, because I really do not think they have met -- they have tied the dots on his knowledge.

THE COURT:  Okay.

MR. ROBINSON:  Thank you.

THE COURT:  Thank you very much for the argument. I appreciate it.

(Proceedings concluded.)

19

          I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/Jordan Keilty                        10/9/25
Transcriber                             Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:


/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.